228 N.J. Super. 610 (1988)
550 A.2d 764
JMB ENTERPRISES AND JAMES M. BIZOKAS, PLAINTIFFS-APPELLANTS,
v.
ATLANTIC EMPLOYERS INSURANCE COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 25, 1988.
Decided November 23, 1988.
*611 Before Judges PRESSLER and O'BRIEN.
Robert E. Edwards argued the cause for appellants.
Mark M. Cieslewicz argued the cause for respondent (Bernadette A. Duncan, attorney; Mark M. Cieslewicz, on the letter brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
*612 Plaintiff JMB Enterprises, a partnership which owned rental premises in Ocean City, brought this action against its casualty insurer, defendant Atlantic Employers Insurance Company, claiming that it had sustained property losses within the coverage of the policy which defendant had wrongfully refused to pay. Following a bifurcated trial on the issue of liability alone, the judge, based on the jury's answers to special interrogatories, entered judgment in plaintiff's favor on its three claims of vandalism losses and against plaintiff on its claim of loss resulting from the freezing of the plumbing system. Thereafter, the parties reached a settlement on the amount of plaintiff's vandalism damages. Final judgment was accordingly entered in that amount on the vandalism-loss counts of the complaint and dismissing the freezing-loss count. Plaintiff appeals, claiming that the special interrogatories submitted to the jury with respect to the freezing loss elicited inconsistent answers which precluded the entry of a no cause judgment on that count. We agree.
Since the vandalism loss is no longer in issue, we direct our attention solely to the claimed freezing loss. We note first that defendant never disputed the fact that such a loss took place and indeed stipulated at trial that, some time late in January 1985, the pipes and radiators in the house froze and burst resulting in substantial damage to the premises. The disputed issue was whether the loss was within the coverage of the policy, which provided in relevant part that "freezing of a plumbing ... system ... while the dwelling is vacant, unoccupied or being constructed" is an included risk only if the insured has "used reasonable care to: (a) maintain heat in the building, or (b) shut off the water supply and drain the system and appliances of water."
Plaintiff's primary witness was its managing partner James *613 M. Bizokas.[1] Bizokas testified that the partnership had acquired the premises, which are located in a summer resort shore area, as an investment property in 1981. It was an old four-story frame building consisting of a first floor apartment as well as a second rental unit which occupied the second, third, and fourth floors. For some time plaintiff had leased the first floor apartment on a year round basis and the upper unit as a summer rental. The first floor apartment became vacant in May 1984 when plaintiff finally succeeded in evicting tenants who did not pay their rent, did significant damage to the property, and ran up a substantial unpaid heating bill. Two groups of summer transients occupied the upper unit in the summer of 1984. The unit was not relet after the second group left in July 1984 because of the damage it did to that apartment. Plaintiff then decided to sell the property, engaging the services of Grace Realty, the agency which managed the rental and occasionally, on specific instruction by plaintiff, obtained the services of various contractors for lawn mowing and other such minor chores.
According to Bizokas' testimony, in the fall of 1984 he sent his regular plumber, Bill Rebel, whose business was apparently located in Camden County, to the premises to "winterize" the property, that is, to drain the water out of the plumbing system and appliances. In late November or early December 1984, he received a call from a John Turnbull of Grace Realty, who told him that the house had been broken into and the water apparently turned back on. Bizokas then told Turnbull that
the property had been winterized. And that if there was water in there that he should do something about it. And he had asked whether or not I wanted to use my plumber and/or his plumber, and I told him to take care of it rather than send my plumber all the way down just for that.
Q. By "your plumber" did you mean Bill Rebel?
A. Bill Rebel, yes.

*614 Q. Why didn't you want to send Bill Rebel all the way down for that?
A. Because they have plumbers right there in Ocean City that I knew and they used, and they could do it just as adequately as he could. There wasn't any advantage to having him travel down from Cherry Hill or Westville.
* * * * * * * *
Q. Did you hear anything further from Mr. Turnbull after this telephone conversation?
A. No, he said he would take care of it and that was all I needed to know.
The next communication Bizokas received from Grace Realty was the news in January 1985 that the pipes had frozen and burst. Neither Mr. Turnbull nor anyone else from Grace was called as a witness by either party. Hence, there was no indication of whether Mr. Turnbull failed to have the property rewinterized, or if it was improperly rewinterized, or if properly winterized, the premises were again broken into and the water turned on. In any event, plaintiff made its freezing-loss claim, and defendant rejected it for the reason, which was made clear at trial, that its claims investigator did not believe that the property had ever been winterized in the first instance.
In submitting the freezing-loss claim to the jury, the judge told it that "there is no issue here about whether plaintiff had the property winterized prior to that winter season" but that the issue was only as to the alleged rewinterizing. Hence, the jury was instructed that the ultimate factual question for its determination was whether, in respect of the rewinterizing, plaintiff had complied with the above-quoted policy language which the trial judge then read and explained. The judge also instructed the jury that the only inference it could draw from the freezing was that Mr. Turnbull had done "nothing insofar as the instructions from the plaintiff are concerned." The judge was also of the view that if Grace Realty was plaintiff's agent in respect of the rewinterizing, plaintiff would be chargeable with any negligence or impropriety in its conduct. In implementing his views of the legal and factual issues, the judge then framed these interrogatories for the jury to answer with respect to the freezing loss:

*615 4(a) Do you find that the plaintiff acted with "reasonable care" in his attempt to comply with the conditions and requirements of Paragraph 2, under the Perils Insured Against provision of the insurance policy?
Yes ____ No ____
4(b) Do you find that plaintiff gave sufficient instruction or direction to Mr. Turnbull, of Grace Realty, as to what plaintiff wanted done at the property, so that it would fully comply with the requirements or conditions set forth in paragraph 2, namely that he would shut off the water supply and drain the system and appliances of water.
Yes ____ No ____
4(c) Do you find that Mr. Turnbull was designated as plaintiff's agent to act on his behalf in performing the function or functions which you find plaintiff told him to do?
Yes ____ No ____
The jury was further instructed to address each successive question only if the previous answer or answers were affirmative. The jury answered question 4(a) in the affirmative, 4(b) in the negative, and consequently did not reach 4(c). Based on the negative answer to 4(b), the trial judge directed the entry of a no-cause verdict on the freezing-loss claim.
Following entry of the verdict, plaintiff moved for a new trial based on the asserted inconsistency between the jury's answer to question 4(a) and its answer to 4(b). The judge not only denied the motion but added gratuitously that if the jury's answers had resulted in a liability verdict in plaintiff's favor, he would have decided defendant's motion for judgment, on which he reserved decision pursuant to R. 4:40-2, in defendant's favor. It was his then expressed view that since Grace Realty was plaintiff's agent, plaintiff was bound by its negligence. It was his further view that plaintiff was barred from recovery under the terms of the policy since it had not proved an actual physical attempt to drain the pipes.
Before considering the judge's theory of the case, we deal first with plaintiff's claim that the jury's answers to questions 4(a) and 4(b) were irreconcilably inconsistent. We agree that they are. First, question 4(a) must be deemed to deal only with the rewinterizing of the plumbing system since that was the only factual issue submitted to the jury in respect of the *616 freezing-loss claim. By its answer to that question, the jury must have concluded that plaintiff had acted reasonably, within the policy terms, in attempting to drain the plumbing system after the initial winterizing. Since all that plaintiff did was to instruct Grace Realty to engage a plumber to do that job, the jury must have also concluded that the giving of that instruction to Grace was a reasonable way for plaintiff to discharge its policy obligations. But by its answer to question 4(b), the jury apparently found that plaintiff did not give an adequate instruction to Grace Realty. But if the instruction were inadequate, then plaintiff could not have acted reasonably in giving that instruction. And if that were so, then the answer to question 4(a) could not have been affirmative. We need not speculate on how the jury came to decide the two questions so inconsistently. Perhaps it was attributable to the somewhat ambiguous pronouns used in the second question. Perhaps it was attributable to the trial judge's clearly erroneous instruction that the only inference it could draw from the freezing pipes was that Grace Realty had done nothing to implement plaintiff's instructions. The fact remains, however, that there is no ready, logical or practical manner in which the two answers can be reconciled. Their inconsistency thus bespeaks jury mistake or confusion, and consequently the verdict based thereon cannot stand. See Roland v. Brunswick Corp., 215 N.J. Super. 240, 244-245 (App. Div. 1987); Menza v. Diamond Jim's, Inc., 145 N.J. Super. 40, 45 (App.Div. 1976). Compare Bree v. Jalbert, 87 N.J. Super. 452 (Law Div. 1965), aff'd o.b. 91 N.J. Super. 38 (App.Div. 1966).
Since the matter must be retried, we are constrained to speak to the trial judge's view of agency. As we have pointed out, it was his notion that the only inference which could be drawn from the freezing pipes was that Grace Realty had failed to follow plaintiff's instructions to engage a plumber. As noted, however, the proofs could have just as easily supported the inference that the work was improperly done or that it was properly done but the house was reentered. Any of these three alternatives are as likely as any other, and yet it is only the *617 inference accepted by the trial judge which supports a conclusion of negligence or, in the terms of the policy, lack of reasonable care by Grace. More significant, however, is the trial judge's error in assuming that a lack of reasonable care by Grace was imputable to plaintiff because Grace was its agent.
In our view, the trial judge misconceived basic agency principles. It is not every agent whose fault is attributable to the principal. If the principal is the master of an agent who is his servant, the fault of the agent, if acting within the scope of his employment, will be imputed to the principal by reason of respondeat superior. But there is a vast difference between an employee agent and a non-employee agent. And, as a matter of legal terminology, the non-employee agent is, generally, nothing else but an independent contractor. As explained by 1 Restatement, Agency 2d, § 2, Comment b, pp. 12-14 (1958):
The word "servant" is used in contrast with "independent contractor". The latter term includes all persons who contract to do something for another but who are not servants in doing the work undertaken. An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal. * * * Although an agent who contracts to act and who is not a servant is therefore an independent contractor, not all independent contractors are agents. * * *
The word "servant" is thus used to distinguish a group of persons for whose physical conduct the master is responsible to third persons. It is convenient to distinguish this group of persons from other persons for whose physical conduct the employer is not responsible. These latter persons fall into two groups: those who are agents but do not respond to the tests for servants, and those who are not agents. For the purpose of determining whether or not the employer is responsible for their physical conduct, however, it is immaterial whether such persons are agents or are not agents. For this reason the term "independent contractor" is used to indicate all persons for whose conduct, aside from their use of words, the employer is not responsible except in the performance of nondelegable duties.
And as further explained by an Introductory Note to Title B of 1 Restatement, Agency 2d, p. 480:
As the term is here used, independent contractor is the antithesis of servant. It is a technical phrase, used to include all who have agreed with another to act on his account and who are not servants. The term includes all agents who are not servants, as well as many other persons who render services but are not *618 agents; the presence or absence of a fiduciary relation is immaterial in the idea of "independent contractor", although many independent contractors are agents. The accent is upon "independent" and not upon "contractor", since the group of independent contractors" includes persons acting gratuitously.
The whole purpose of employing the term is to negate the special consequences of the master-servant relation, that is, the liability for torts within the scope of employment, and the special duties and immunities of the master to servants.
And see, generally, Montclair Distributing Co. v. Arnold Bakers, Inc., 1 N.J. Super. 568, 574 (Ch.Div. 1948).
Certainly, a non-employee agent owes a fiduciary duty to his principal and may bind him in respect of contractual obligations. Montclair Distributing Co., supra. But his actions are not equatable with the actions of the principal in all circumstances and for all purposes as is ordinarily the case when the agent is a servant. Thus, if plaintiff's own employee failed to comply with his instruction respecting the engaging of plumbing services, that default would have been plaintiff's own. But Grace was not plaintiff's employee. It was an independent contractor of plaintiff even though it may well also have been its agent in the undertaking to procure the required plumbing services. However, if plaintiff was reasonable in retaining Grace's services for that purpose, it is of no consequence, vis-a-vis its obligation under the policy, whether Grace in fact undertook that commission properly. Obviously, plaintiff could be found to have acted with reasonable care had it hired a plumber on whom it reasonably relied but who did the job badly. Hiring another, as it were, to engage a plumber for it is of no material difference, provided that hiring under the circumstances was a reasonable way to proceed to get the ultimate job done. The dispositive question then was not whether Grace was plaintiff's agent but only whether plaintiff acted with reasonable care in instructing Grace to get the draining job done. That is the ultimate question to be determined on retrial.
That portion of the final judgment appealed from dismissing the fourth count of the complaint is reversed, and the matter is remanded for retrial consistent with this opinion.
NOTES
[1] Although Bizokas had originally joined as a plaintiff, the action by him was dismissed at trial with his consent since only the partnership was a named insured.