**AMERICAN TELEPHONE AND TELEGRAPH COMPANY**

v.

**WINBACK & CONSERVE PROGRAM, INC., and Alfonse G. Inga.**

No. 93–5456.

United States District Court,
D. New Jersey.

May 12, 1994.

Frederick L. Whitmer, Francine A. Franklin, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for plaintiff.

H. Curtis Meanor, Lawrence S. Coven, Podvey, Sachs, Meanor, Catenacci, Hilder & Cocoziello, P.C., Newark, NJ, Charles H. Helein, Richard H. Waysdorf, Helein, Waysdorf & Mandigo, Washington, DC, for defendants.

## OPINION

POLITAN, District Judge.

This matter comes before the Court on plaintiff's application for a preliminary injunction. For the reasons discussed below, plaintiff's application is **DENIED**.

## I. *FINDINGS OF FACT*

### A. Background

Plaintiff, American Telephone and Telegraph Company, ("AT & T"), is engaged in the business of marketing and providing a wide variety of telecommunications services. AT & T markets its long distance telecommunications services under a variety of service marks and trademarks including its initials "AT & T" and its "globe" symbol. Defendant, Winback & Conserve Program, Inc., ("WCPI" or "Winback"), is an aggregator of 800 inbound telecommunications services which offers end users access to the AT & T 800 inbound network at a discounted price. Defendant, Alfonse G. Inga, ("Inga"), is President of WCPI.

The advent of resale and aggregation in the telecommunications industry can be traced to the 1976 ruling of the Federal Communications Commission, (the "FCC"), that required AT & T to offer for resale its long distance telecommunications services. *See Resale and Shared Use of Common Carrier Domestic Public Switched Network Services,* 60 F.C.C.2d 261 (1976); 83 F.C.C.2d 167 (1980); *see also AT & T v. FCC,* 572 F.2d 17, 20 (2d Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978). The FCC requirement that AT & T offer its long distance telecommunications services for resale created the opportunity for businesses, such

as WCPI, to subscribe to a high volume/high discount long distance telecommunications service that uses access to AT & T's long distance network to provide its own long distance service to its own customers.

WCPI does not employ any individuals on its staff who engage in the marketing and sale of the Winback product. Instead, WCPI utilizes a network of sales or marketing representatives to market its 800 service discount plan. The network consists of approximately 50 different marketing/sales agencies. Those agencies in turn employ and/or contract with the individual sales representatives, numbering approximately 1000. The agencies generally market a wide array of telephone services offered by various parties, including other aggregators and in some instances the agency's own aggregation plan. The sales representatives do not work at WCPI locations. They are not reimbursed for nor are they provided with any supplies or equipment necessary to operate the office. They do not receive salaries from WCPI but rather are compensated on a pure commission basis by WCPI for the sales which they make. They are not told how to select customers. They are not obligated to WCPI in terms of quotas, hours, length of commitment, etc.

They are, however, supplied with two forms from WCPI which make reference to WCPI in some way and which are required by AT & T to effectuate the transfer of service from the existing carrier to WCPI. Additionally, there was testimony to the effect that at least one of the representatives contacts Inga on a periodic basis for advice concerning the marketing of the product. Inga testified that he has taken steps and believes that it his responsibility to take such steps to "police" the representatives in the marketing of the product to avoid misrepresentations in the solicitations.

Essentially, the process works as follows: The sales representative makes the contact with the end user and offers to the end user an opportunity to join the WCPI discount plan. The benefit of joining the WCPI plan is to allow the end user to maintain its current access or to gain access to the AT & T 800 inbound network at a rate below the end user's current rate or a rate that the end user could not obtain on its own individual account. If the end user is interested in joining the WCPI plan, the sales representative forwards various forms to the end user, including a facsimile cover sheet, various informational documents, a Transfer of Service Agreement and Notification form ("transfer form") and a Main Billed Telephone Numbers Location List ("main billed form"). The end user then fills out the transfer form and the main billed form and returns them to the sales representative. The representative will then forward the forms to the primary marketing or sales agency. The agency forwards the forms on to the appropriate carrier or aggregator, in this case WCPI. WCPI then forwards the transfer form and main billed form to AT & T.

Once the end user joins the WCPI plan, the end user becomes the customer of WCPI while WCPI is the customer of AT & T. Notwithstanding this transfer of service, however, AT & T directly bills the end user and the end user makes payment directly to AT & T. Additionally, Inga testified that in many cases WCPI executes letters of agency which essentially allow the end users to receive the services associated with access to the AT & T network directly from AT & T. At the end of each month, AT & T forwards to WCPI a check in the amount of the difference between the discount earned by WCPI and the average discount that WCPI passes on to the end user. WCPI similarly sends a commission check to the marketing representatives for its share of the sales on a monthly basis.

The instant dispute arises out of the solicitation of end users by various sales representatives who market the Winback program. AT & T alleges that in contacting and soliciting end users for the Winback plan various sales representatives either improperly state that they are with AT & T or falsely mislead the end user into believing that the Winback plan is an official AT & T program which is offered by or affiliated with AT & T. AT & T contends that WCPI and the sales representatives are engaging in the unauthorized practice of using the letter designation AT & T and the AT & T globe symbol predomi-

nantly and pervasively throughout Winback advertisements, other marketing materials and forms provided to the end users. Complaint ¶ 17, 24. AT & T further claims that various materials being circulated and used by WCPI and the various sales representatives indicate that the forms would be submitted to a nonexistent "AT & T Input Department." *Id.* ¶ 23. AT & T also claims that WCPI and the sales representatives in the marketing of the Winback product regularly make oral misrepresentations to end users indicating that they are "the marketing arm of AT & T," *id.* ¶ 25, are from AT & T or are affiliated with AT & T.

AT & T came before the Court in December of 1993 seeking a Temporary Restraining Order ("TRO") and an Order of Contempt against defendant Inga for violation of a final Consent Order entered May 7, 1992 in the related case of *AT & T v. One Stop Financial, Inc.*, Civil Action No. 92–1489. In support of its application AT & T presented to the Court, *inter alia*, approximately ten certifications from various end users who claim to have been misled as to the origin of the product offered by the sales representatives who were marketing the Winback program. On that day, this Court indicated that the contempt proceeding would not be heard until discovery had been completed. The Court did, however, hear the parties on plaintiff's application for a TRO. Finding substantial credible evidence that instances of infringement were occurring, this Court was persuaded at the time that the imposition of temporary restraints was necessary. *See* Transcript of Proceedings 12/15/93 at 57–66.

The restraints placed upon defendants, together with their officers, agents, servants, employees, attorneys and all persons in active concert or participation with them, or who market under the name of WCPI, at that time included a prohibition on the use of any oral or written communication falsely designating defendants' goods and services as being those of AT & T, sponsored by AT & T, or affiliated with AT & T. Similarly, defendants were enjoined and restrained from engaging, producing, creating, encouraging, aiding or abetting any oral communication, advertisement, label, sign, flyer, envelope, correspondence or any other oral or written communication which enables defendants to pass off their goods or services as being those of AT & T. The Order also included a mechanism whereby defendants were required to serve the Order upon all persons identified on a list as WCPI's primary agents. The so-called primary agents were then required to serve the Order on each and all persons or entities whom the primary agents had authorized to market under the name, mark, or authority of WCPI.

The parties consented to the extension of the TRO until such time as discovery was completed with respect to the preliminary injunction application and this Court's decision thereon. During discovery the depositions were taken of each of the approximately ten end users whose certifications were submitted in support of the TRO application. All certifications and depositions were made a part of the record for the Court to consider in determining the instant motion.[1] Additionally, at the hearing on the preliminary injunction application, Inga and Thomas Salzano, the President of Agency Services Group, Inc., one of the marketing agencies with whom Inga deals, testified. Because the issue before the Court is extremely fact sensitive, a brief summary of the proofs adduced in the record is necessary.

### B. Summary of Evidence

#### 1. Plaintiff's Proofs

##### a. Debra Dahl Vogel

Debra Dahl Vogel, the Telecommunications Network Coordinator for a concern

---

1. The Court notes that the certification and deposition of a one Arthur Holloway were also taken during this proceeding. AT & T submitted the Holloway testimony in support of an allegation that certain sales representatives were forging the signatures of end users. At the hearing on plaintiff's application for a TRO, this Court declined to place any significance on the Holloway testimony because it was the only proof of forgery offered by plaintiff. Because plaintiff has not brought any additional proofs to the Court on this issue and because Inga testified that he terminated his relationship with that particular agency upon learning of the incident, the Court finds the Holloway testimony similarly insignificant with respect to plaintiff's application for a preliminary injunction.

known as The Toro Company, testified that sometime during October 1993 she received a facsimile transmission entitled "Winback & Conserve Program for AT & T 800 Customers." The first page of the transmission described certain details of the Winback program ("information form"). The second page was a main billed form on which the words "Winback & Conserve Program" appeared prominently at the top of the page. Vogel testified that as a result of the appearance of the documents and their failure to designate Winback & Conserve Program as a separate entity, she believed them to be official AT & T documents. Vogel Certif. at ¶ 9; Vogel Dep. at 14–15.

### b. Ekaterina Hall and Karen Kelly

Ekaterina K. Hall is a secretary and receptionist at FMC Corporation. Karen Kelly is the office manager for the Western Region Sales Office for FMC. According to Hall, on or about October 29, 1993 she received a call from an individual representing him or herself as being "from AT & T." After Hall requested some literature concerning the Winback program, she received a three-page facsimile consisting of the following: (1) a facsimile cover sheet announcing "The New AT & T 800 Winback & Conserve Program" and further stating, "Please authorize discount acceptance immediately and fax back to 1–800–251–5491 for forwarding to the AT & T Input Department;" (2) a transfer form exhibiting the AT & T initials and the AT & T globe; and (3) a main billed form indicating at the top of the form "Winback & Conserve Program." Upon receiving the forms, Hall forwarded the forms to Kelly for Kelly's review. Based upon Kelly's review of the forms and Hall's description of the telephone conversation, Kelly testified that she believed the documents to represent a new "Winback and Conserve Program" offered by AT & T. Kelly Certif. at ¶ 8–9; Kelly Dep. at 37, 40.

### c. Arthur Sanchez

Arthur Sanchez is the President of Golden Contact, Inc. Sanchez testified that on or about October 7, 1993 he received a phone call from a representative of Tariff Consultants. That representative indicated to San-chez that "We represent AT & T" and specifically answered "no" to the question of whether Tariff Consultants was an aggregator or a consolidator. The caller's supervisor stated that "Tariff Consultants was a marketing arm of AT & T" and that Tariff Consultants was not an aggregator or consolidator. Sanchez thereafter received a four-page facsimile transmission which included the following: (1) a facsimile cover sheet not indicating the source company but stating "We are bringing you together for less with AT & T network services;" (2) a transfer form displaying the AT & T initials and globe symbol in the corner; (3) an End User Information sheet indicating account numbers and 800 numbers associated with the respective accounts; and (4) an information form setting forth specific details of the program and instructing the end user to complete the accompanying main billed form "provided to us by AT & T." Sanchez testified that the oral misrepresentations and appearances of the facsimile cover sheet and the transfer form led him to believe that he was dealing with AT & T. Sanchez Certif. ¶ 14; Sanchez Dep. at 7, 8, 23, 50, 85, 86.

### d. Daniel Flood

Daniel Flood is the Facilities Administrator at Kubota Pacific Computer. Flood stated that on or about October 5, 1993, he received a phone call from a person named Nick whom he believed to be affiliated with AT & T. Nick thanked him for staying with AT & T and said "We appreciate your business." Nick also indicated in some way that he was "calling with the Winback and Conserve Program affiliated with AT & T." Flood Dep. at 20. After the introductory comments, Nick forwarded the following documents to Flood by facsimile transmission: (1) a cover sheet stating "The New AT & T 800 Winback & Conserve Program" and further stating, "Please authorize discount acceptance immediately and fax back to 1–800–251–5491 for forwarding to the AT & T Input Department;" (2) a main billed form; (3) a form entitled AT & T 800 Readyline Summary of Charges ("summary of charges form") displaying the AT & T initials and globe; and (4) a transfer form also exhibiting the AT & T initial and the AT & T globe.

Flood testified that until he had a second conversation with Nick and until he conducted a closer examination of the documents he believed the Winback & Conserve Program was an official AT & T program. Flood specifically identified the oral communications, the cover sheet and the transfer form as the bases for his misconception that he was dealing with AT & T. Flood Certif. at ¶ 7; Flood Dep. at 23–24, 28, 45.

### e. Thomas Malanga

Thomas Malanga, the Director of Technical Support and Computer Operating of Sunshine Biscuits, Inc. testified that on October 7, 1993 he received a telephone call from someone claiming to be with AT & T. The caller requested that Malanga forward to him a copy of his AT & T summary of charges. He did so and on the following day Malanga received several documents from the caller consisting of the following: (1) several "End User Information" forms referencing "Winback & Conserve Program"; (2) an information form making several references to "Winback & Conserve Program;" (3) a transfer form displaying the AT & T logo and the globe symbol; and (4) a Winback and Conserve Program letter of guarantee making several references to "Winback & Conserve Program." Malanga testified that because (1) the plan was continually referenced in the documents as Winback & Conserve Program without any indication that Winback was its own corporate entity; (2) the caller reassured him that she was with AT & T; and (3) the transfer form exhibited the AT & T initials and globe, he believed he was dealing with AT & T. Malanga Certif. at ¶ 7; Malanga Dep. at 39–40.

### f. Philip Kenney

Philip Kenney is the First Vice–President and Manager of the Los Angeles Municipal Bond Department for Prudential Securities. Kenney testified that on or about October 6, 1993 he received a telephone call from a person who first asked if he was happy with the 800 service he had been receiving. The caller never identified himself as being from an entity independent of AT & T. The caller then informed Kenney that he could obtain up to 20% off his current 800 service costs. From the tone of the caller's voice, Kenney assumed he was speaking with an AT & T representative. Later that day and subsequent to the telephone conversation, Kenney received a facsimile transmission of the following documents: (1) a cover sheet announcing "The New AT & T 800 Winback & Conserve Program" and further stating, "Please authorize discount acceptance immediately and fax back to 1–800–251–5491 for forwarding to the AT & T Input Department;" (2) a copy of an AT & T summary of charges form; (3) a main billed form referencing "Winback & Conserve Program"; and (4) a transfer form displaying the AT & T initials and globe logo on the top of the letterhead. Kenney testified that because of the many references to AT & T in the documents and because of the context of the phone conversation, he believed he was dealing with AT & T. Kenney Certif. at ¶ 7; Kenney Dep. at 15–16.

### g. James Angelici

James Angelici, is the Office Manager and Communications Director for State Construction Company. Angelici testified that on or about October 27, 1993 he received a two page facsimile transmission which included the following documents: (1) a main billed form referencing "Winback & Conserve Program" and (2) an information sheet directed "To All AT & T '800' Customers" and referencing the "Winback & Conserve Program." From all of the references to AT & T in the documents, in addition to the failure to identify Winback & Conserve as its own corporate entity, Angelici believed that he was dealing with AT & T. Angelici Certif. at ¶ 9; Angelici Dep. at 19–20.

### h. Kay Mills

Kay Mills is the Accounts Receivable Collection Supervisor for Frigoscandia Food Process Systems, Inc. Mills testified that on or about November 7, 1993 she received a two-page facsimile which consisted of the following documents: (1) an information form directed "To All AT & T '800' Customers" referencing "Winback & Conserve Program" and (2) a main billed form also referencing

"Winback & Conserve Program". Mills testified that she believed the source of the information to be AT & T because of the prominent display of the AT & T initials and the wording of the information form. Mills Certif. at ¶ 6.

### 2. Defendants' Response to Plaintiff's Proofs

It is apparent from the certifications and depositions of plaintiff's witnesses that the alleged misleading acts take the form of either or both oral misrepresentations made during the telephone solicitations and/or written communications in the various forms supplied to the end users by facsimile transmission from the sales representatives. As to the oral misrepresentations there are no proofs in the record nor does plaintiff contend that WCPI or Inga encouraged, consented to, advised, or participated in the making of the alleged oral misrepresentations.

As to the written documents, defendants submitted uncontroverted proofs that AT & T originated the transfer form and the main billed form. Transcript of Proceedings 3/1/94 at 80:13–14; 81:23–25; Inga Certif. 2/15/94 at ¶ 8–9. Apparently, AT & T requires all aggregators to use these forms, will not process a transfer without such forms, and prohibits the aggregators from making any changes to those forms. Many of the end users identified the AT & T initials and globe logo on the transfer form as part of the reason they believed that they were dealing with an official AT & T program or representative. By letter dated October 13, 1993, AT & T directed all aggregators to alter the forms to the extent that the AT & T initials and globe logo should be eliminated. As to the main billed form the primary objection pointed to by the end users and plaintiff was the reference to WCPI merely as the "Winback & Conserve Program" without a clear indication the that WCPI was actually its own corporate entity separate and distinct from AT & T. It is unclear from the record whether WCPI or the marketing representatives enter the name of the company on the form.

All other documents about which AT & T and AT & T's witnesses complain were generated by the individual marketing agencies to promote and distribute the Winback product. For instance, Salzano testified that the objectionable cover sheet referenced by Flood was created by his company, Agency Services Group, without any knowledge or input from WCPI or Inga. Transcript of Proceedings 3/1/94 at 38–40. Furthermore, Salzano testified that part of his job as a marketing agency is to supply those employed by him and under contract with him the materials necessary to promote the Winback product. *Id.* at 40. Inga testified that the only forms he sees from the sales representatives are the transfer forms and main billed forms as those forms are required to be forwarded to AT & T in order to effectuate the transfer. Transcript of Proceedings 3/2/94 at 87–88. Inga did clarify that occasionally a sales representative will ask for his pre-approval of marketing materials but it does not appear that such interaction occurs as a matter of course. *Id.* at 90–91. In sum, there are no proofs before the Court that Inga and/or WCPI generate, consent to, or approve any of the objectionable written marketing materials created and utilized by the marketing representatives in the promotion and sale of the Winback product.

## II. *AT & T'S THEORY OF THE CASE*

Having detailed the proofs before the Court, it is important at this juncture to clearly set forth AT & T's proffered theory of liability. Perhaps recognizing that the record is devoid of any proofs of direct involvement by Inga and/or WCPI in the infringing acts, AT & T contends that WCPI and Inga should be held vicariously liable for the misrepresentations of the sales representatives who market and sell the Winback program. Simply stated, AT & T argues that WCPI and Inga authorize the sales representatives to market the Winback program on behalf of and to the direct financial benefit of WCPI and Inga. Accordingly, AT & T urges that with the acceptance of the financial benefits realized from the acts of the sales representatives comes the burden of sharing the responsibility for misrepresentations made by the representatives in carrying out the solici-

tation activities on behalf of WCPI and Inga. AT & T stresses that this is not a contributory infringement case in which AT & T is alleging that WCPI and Inga have in some way induced the infringement. Letter from Frederick L. Whitmer, Attorney for Plaintiff, to the Court of 3/21/94 at 16 [hereinafter "Whitmer Letter"]; Transcript of Proceedings 3/11/94 at 28:16–25.

## III. CONCLUSIONS OF LAW

The standards for issuance of a preliminary injunction are well-settled. The moving party must demonstrate (1) a reasonable probability of eventual success in the litigation; (2) that the movant will be irreparably injured *pendente lite* if relief is not granted; and, where relevant, it must be shown that (3) there is a possibility of harm to other interested persons from the denial of the injunction; and (4) the public interest requires the granting of preliminary injunctive relief. *Eli Lilly & Co. v. Premo Pharmaceutical Labs, Inc.,* 630 F.2d 120, 136 (3d Cir. 1980); *SK & F, Co. v. Premo Pharmaceutical Labs, Inc.,* 625 F.2d 1055, 1066–68 (3d Cir.1980); *Fotomat Corp. v. Photo Drive–Thru, Inc.,* 425 F.Supp. 693, 701 (D.N.J. 1977).

### A. Reasonable Probability of Success on the Merits

■ Section 43(a) of the Lanham Act condemns a false or misleading description of goods or services. *U.S. Healthcare v. Blue Cross of Greater Philadelphia,* 898 F.2d 914 (3d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). Section 43(a) provides, in pertinent part, that:

[a]ny person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol or device ... or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which ... is likely to deceive as to the affiliation, connection or association of such person with another person, or as to origin, sponsorship, or approval of his or her

goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The elements of the tort of unprivileged imitation under Section 43(a)[2] are "(1) that the imitated feature is non-functional, (2) that the imitated feature has acquired a 'secondary meaning', and (3) that consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *American Home Products v. Barr Laboratories,* 834 F.2d 368, 370 (3d Cir.1987).

### 1. Common Law Agency Analysis

■ Section 43(a) prohibits "[a]ny person" from engaging in certain delineated misleading acts. Given AT & T's theory of vicarious liability, this Court must determine if WCPI and/or Inga, the named defendants qualify as "[a]ny person" within the meaning of the Lanham Act. The first step in the analysis is the recognition that trademark infringement is a species of tort. *Hard Rock Cafe Licensing v. Concession Services,* 955 F.2d 1143, 1148 (7th Cir.1992). As such, to determine the boundaries of liability it is appropriate to turn to the common law. *Id.*

■ In the instant matter AT & T contends that under well-established principles of the common law of agency WCPI and Inga, the principals, can be held liable for the acts of the sales representatives, the agents, acting within the scope of their actual, implied or apparent authority. WCPI and Inga do not dispute the applicability of the common law of agency. They contend, however, that the sales representatives are independent contractors over whom Inga and WCPI have no control. WCPI and Inga argue that under the common law of agency it is well-settled that a principal may not be held liable for the acts of his independent contractors except in certain limited situations such as where the independent contractor is engaged to perform some ultrahazardous activity. Because the instant case does not present

---

2. The federal law of unprivileged imitation under Section 43(a) is equivalent to the New Jersey law of unprivileged imitation. *American Home Prod-* *ucts v. Barr Laboratories,* 656 F.Supp. 1058, 1061 (D.N.J.1987).

one of these limited situations, WCPI and Inga maintain that AT & T's application must fail.

■ The New Jersey Supreme Court has recently discussed in detail the distinctions between agents and independent contractors. *See Sears Mortg. Corp. v. Rose,* 134 N.J. 326, 634 A.2d 74 (1993); *Baldasarre v. Butler,* 132 N.J. 278, 625 A.2d 458 (1993). An agency relationship is established "when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortg. Corp.,* 134 N.J. at 337, 634 A.2d 74 (citing *Arcell v. Ashland Chemical Co.,* 152 N.J.Super. 471, 494–95, 378 A.2d 53 (Law Div.1977); 2A *C.J.S. Agency* § 37 (1972); *Restatement (Second) of Agency* § 1 (1958)). The determination will rest on a factual analysis of the conduct of the parties regardless of the terms the parties ascribe to the relationship. *Id.* It has been recognized that direct control is not necessary to establish an agency relationship, but that a court must look to the totality of the circumstances. *Id.* 134 N.J. at 338, 634 A.2d 74.

In *Baldasarre v. Butler,* 132 N.J. 278, 625 A.2d 458 (1993), one of the issues faced by the court was whether a client could be held vicariously liable for the tortious acts of his attorney. *Id.* at 291–92. The *Baldasarre* Court recognized that " 'there is a vast difference between an employee agent and a non-employee agent.... [T]he non-employee agent is generally, nothing else but an independent contractor.' " *Id.* at 291, 625 A.2d 458 (quoting *JMB Enter. v. Atlantic Employers Ins.,* 228 N.J.Super. 610, 617, 550 A.2d 764 (App.Div.1988)). "The status of independent contractor is 'characterized by the attributes of self-employment and self-determination in the economic and professional sense.' " *Id.* (quoting *Rokos v. State, Dep't of Treasury,* 236 N.J.Super. 174, 181, 564 A.2d 1217 (App.Div.1989)). After examining the relationship between the parties, the court determined that the attorney was merely an independent contractor. Accordingly, where there was no proof that the client directed, advised, consented to or participated in the attorney's wrongful conduct, the court declined to find the client vicariously liable for the acts of the attorney on an agency theory.

This Court, too, must look to the relationship between WCPI and Inga and the sales representatives who market the Winback program to determine the appropriate status of their relationship. In this regard, Inga testified that he does not employ any individuals within WCPI who perform any marketing or sales function. The uncontroverted testimony of Inga indicates that the only persons who market the Winback program are persons associated with the various marketing agencies. Additionally, defendants have submitted certifications from the officers of the various marketing agencies implicated by plaintiff's proofs. In each certification the officer described his company as a company that markets long distance telephone services that are offered by various companies, including in some instances its own competing aggregation plan. Each officer stated that neither its company nor its employees receive salaries from WCPI but are paid on a strict commission basis for the sales that are made. Furthermore, each officer indicated that neither the company nor its employees operate out of WCPI's offices nor are they supplied facilities, equipment, or reimbursement for operating expenses by WCPI. *See* Certifications of Joseph Kearney, General Manager of Tariff Advisory Group; James Maguire, President of Tariff Consultants, Inc.; Thomas Salzano, President of Agency Services Group, Inc.; Jeffrey Pink, President of Telnet Systems, Inc.

It appears that WCPI's interaction with the sales representatives is somewhat limited. Other than the forms required by AT & T to process the orders (the transfer form and main billed form) WCPI does not supply any marketing materials, forms or supplies to the marketing companies. The sales representative forwards the AT & T transfer form and main billed form along with his or her own facsimile or information sheets to the prospective end user. When the end user commits to the transfer to the Winback program via the completing of the transfer and main billed forms, the sales representative then forwards those forms to the primary marketing agency which in turn for-

wards the forms back to WCPI. The sales representative is supposed to place an identification number referencing the primary marketing agency with whom he or she is associated on the forms so that his or her identity can be traced for purposes of routing commission payments and directing questions where appropriate. WCPI then forwards the forms to AT & T thereby effectuating the transfer to the WCPI program. Other than the above-described activities, it was established that Inga and at least one sales representative, Thomas Salzano, engage in periodic discussions concerning the promotion of the Winback product. Additionally, Inga claims to attempt to "police" the sales representatives in the promotion of the product. Finally, the sales representatives play an integral role in the success of WCPI, financially and otherwise, in that all sales are conducted through these agencies and individuals.

Based upon the proofs as detailed above, this Court finds that the sales representatives engaged by WCPI and Inga are independent contractors. In turn, the representatives are primarily employees of or under contract with independent telecommunications agencies that market on behalf of other companies as well as on behalf of WCPI and on behalf of themselves. Recognizing the distinctions between employees or agents and non-employees or independent contractors, the Court is persuaded that under the totality of the circumstances, these sales representatives are independent contractors over whom WCPI and Inga exercise insufficient control to amount to an agency relationship.

*Baldasarre, supra,* is instructive on this point. In *Baldasarre,* just as the attorney was not subject to the direction and control of his client in performing the day-to-day aspects of the job for which he was hired, so too are the sales representatives not subject to the direction and control of Inga and WCPI in the everyday aspects of conducting the business of promoting and selling the Winback product. That is not to say that the client in the *Baldasarre* case had no involvement whatsoever in the attorney's performance of his job or that WCPI and Inga have no involvement in the business of promoting and selling the Winback product. An examination of the *Baldasarre* opinion reveals multiple contacts between the attorney and the client with the client dictating to the attorney the terms that would be acceptable for the consummation of the deal that was at issue in the case. Surely, any attorney-client relationship embodies some level of joint activity in the course of the representation. Yet, despite the existence of such joint activity, the *Baldasarre* court declined to extend liability to the client on an agency theory where the client did not advise, consent, direct or participate in the misconduct. In the instant case, the level of joint activity between WCPI and Inga and the sales representatives is similarly minimal and peripheral to the nuts and bolts of the business of marketing and promoting. Furthermore, as detailed above, no proof was submitted to the Court to establish that WCPI or Inga advised, consented to or participated in the alleged misrepresentations. Accordingly, plaintiff has failed to establish sufficient proof that the sales representatives are any more than independent contractors.

### 2. Analogous Cases [3]

■ Plaintiff contends that the consequences of finding that WCPI and Inga cannot be held vicariously liable for the acts of the sales representatives "would 'be most iniquitous and most dangerous, and give shelter and encouragement to all kinds of fraud . . .' " Whitmer Letter, at 19 (quoting *First*

---

**3.** At the hearing on plaintiff's application, plaintiff cited the unpublished opinion of the Honorable Harold A. Ackerman on AT & T's application for a preliminary injunction in the matter of *AT & T v. Telcom United North, Inc. and F.E. United, Inc.,* Civil Action No. 93–1135. Telcom is a reseller of AT & T services. In *Telcom,* AT & T similarly charged that Telcom sales representatives were engaging in misleading practices in the solicitation of Telcom's competing long distance plan. Telcom contended, in part, that the sales representatives were independent contractors over whom Telcom had no control and thus, Telcom could not be held liable for their acts. Judge Ackerman rejected Telcom's argument. Because the factual record on this issue appears to be more fully developed in the instant matter, this Court respectively declines to follow Judge Ackerman's decision in *Telcom.*

*Alabama Bank v. First State Ins. Co.*, 899 F.2d 1045, 1061 n. 8 (11th Cir.1990)). The Court's conclusion, however, is not contrary to results reached by other courts considering the issue in analogous situations. Specifically, treatment of trademark infringement cases in the area of licensors who grant licensees the right to market the licensor's product serves as a persuasive analogy to the situation presently before the Court.[4]

For instance, in *Oberlin v. Marlin American Corp.*, 596 F.2d 1322 (7th Cir.1979), Melabs of California, the manufacturer of a portable electronic telephone, entered into a contract with Marlin American Corporation whereby Marlin undertook to be the distributor of Melabs' telephone product. The agreement between the parties gave Marlin the exclusive right to market the phone. Melabs obligated itself to issue a standard warranty, to provide service contractors and replacement parts. *Id.* at 1324. Marlin obligated itself to develop and be responsible for the brochures, sales aids, advertising, etc. *Id.* As part of the marketing effort, Marlin established and advertised a nationwide franchising plan. *Id.* at 1325. The plaintiff, William Oberlin, relying upon the marketing information from Marlin entered into a franchise agreement with Marlin to market and sell the telephone. *Id.* Subsequently, Oberlin learned that the telephone company had no telephone numbers available for the telephones, thus making it virtually impossible to market the phones. *Id.* Accordingly, Oberlin instituted suit against Marlin, Melabs, and SCM Corporation, an entity which purchased the assets of Melabs. Oberlin sought to hold Melabs and SCM liable for the allegedly fraudulent acts of Marlin on an alleged principal-agent relationship basis. *Id.*

Recognizing that Melabs' and SCM's liability under the agency theory turned on the relationship between the parties, the court examined factors such as the extent of control exercised and the intent and functioning of the parties in their relationships with each other. *Id.* at 1326. The court found that the marketing agreement gave Melabs the right to approve all contract forms and determined that uniform terms, conditions and prices would be offered to ultimate distributors. Furthermore, the marketing agreement also transferred to Melabs the ownership of the distributorships established by Marlin in the event of Marlin's default or bankruptcy. Finally, there was evidence in the record that Melabs exercised approval rights over the use of SCM trademark in advertising materials. *Id.* After examining all of these factors, the court held that neither the contract nor the advertising practice demonstrated the "elements of constancy or detail characteristic of the control a principal exercises over his agent." *Id.* and cases cited therein.

The plaintiff in *Oberlin* also contended that because SCM/Melabs allowed Marlin to use the SCM trademark in its advertising, the federal trademark law created a duty in SCM to supervise Marlin in its use of the trademark. In response to this argument the *Oberlin* court stated:

> The purpose of the Lanham Act … is to ensure the integrity of registered trademarks, not to create a federal law of agency. Furthermore, the scope of the duty of supervision associated with a registered trademark is commensurate with this narrow purpose. The duty does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question. It does not automatically saddle the licensor with the responsi-

4. The law is clear that a franchisor is under no duty to "diligently prevent the independent acts of trademark infringement that may be committed by a single franchisee." *Mini Maid Services v. Maid Brigade Systems*, 967 F.2d 1516, 1519 (11th Cir.1992). The licensor's duty of supervision flows only to the supervision of the "licensee's *use of the licensor's own trademark.*" *Id.* (emphasis supplied) (citations omitted). This rule derives from "the Lanham Act's abandonment provisions, which specify that a registrant's mark may be canceled if the registrant fails to control its licensees' use of the licensed mark". *Id.* (citing 15 U.S.C. § 1064(5)(A)). The purpose of the rule is thus to "protect the public from being misled about the quality or consistency of the products offered under the licensor's trademark." *Id.* Although the instant case is concededly not a case involving a licensor/licensee relationship, for the reasons discussed *infra*, the Court is persuaded that the sales representatives are more factually analogous to licensors than to the agents which are found in the cases relied upon by plaintiff.

bilities under state law of a principal for his agent.

*Id.* at 1327; *see also Mini Maid,* 967 F.2d at 1520 (quoting from *Oberlin* with approval in case where issue involved liability of franchisor for trademark infringement by franchisee).

Although the Lanham Act itself does not give rise to liability under a federal law of agency, *Oberlin,* 596 F.2d at 1327, the Court can conceive of situations where a principal should quite properly be held liable for the infringing acts of its agents under a common law agency theory. *See Hard Rock Cafe,* 955 F.2d at 1150 (recognizing the existence of vicarious liability under the Lanham act, but ultimately finding that under facts of that case the requirements for vicarious liability were not satisfied). This case, however, does not present one of those situations.

Like Melabs in the *Oberlin* case, WCPI provides separate and distinct marketing or sales agencies the right to market the Winback product.[5] The parties enter into a written contract governing the relationship between them. The product, of course, is not a physical object like a telephone, rather it is the access to the AT & T 800 inbound network. Like Melabs, WCPI vests the marketing responsibility of the product in an entity or entities independent of WCPI, namely the various marketing agencies referenced in the proofs before the Court. Also, like Melabs, WCPI has no involvement in the day-to-day operations of the marketing companies. Accordingly, the proofs before the Court do not "demonstrate the elements of constancy or detail characteristic of the control a principal exercises over his agent." *See Oberlin,* 596 F.2d at 1326.

Plaintiff directs the Court's attention to various cases which stand for the proposition that principals can be held liable for the acts of their agents acting within the scope of their authority. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982)[6] (non-profit professional society held vicariously liable for the acts of its subcommittee's Chairman and Vice-

---

5. In *Oberlin,* the court rejected plaintiff's agency by estoppel argument in part because the advertisements for the product expressly described Melabs as the producer and Marlin as the distributor of the telephone. *Oberlin,* 596 F.2d at 1327 n. 5. The proofs before the Court are extremely unclear as to whether or not the sales representatives hold themselves out to be WCPI in making the solicitations or whether or not WCPI knowingly permits its name to be used in the course of solicitations without qualification from the representatives that they are from independent marketing agencies engaged to sell and promote the Winback program on behalf of WCPI. For instance, Arthur Sanchez testified that the caller claimed to be from Tariff Consultants and to be offering the Winback & Conserve Program. Sanchez Certif. at ¶ 5. Flood testified, however, that the caller said something to the effect that he was affiliated with Winback & Conserve. Flood Dep. at 20:18–19.

The sparsity of proofs on this issue is probably a result of the basis of plaintiff's claim, namely that the representatives do not properly identify themselves at all, rather they hold themselves out as representing or being from AT & T. In any event, the Court declines to make any ruling based upon an agency by estoppel theory in that the specific issue was not argued to the Court and because the Court does not have sufficient proofs before it on the record at this time regarding the nature of a routine "proper" solicitation for the Winback program.

6. In *Hydrolevel,* a manufacturer of fuel cutoffs for boilers brought an action against the American Society of Mechanical Engineers for antitrust violations. The Society, a non-profit organization, promulgated advisory safety codes for the industry, many of which had been incorporated into the federal regulations. Hydrolevel competed with a company called McDonald and Miller, Inc. ("M & M") in the marketing of a certain low-level fuel cutoff device in water boilers. An M & M Vice–President also served as a Vice–Chairman of the Society's subcommittee that drafted the code dealing with the safety devices in question. Additionally, the Chairman of the subcommittee at the time was an Executive Vice–President of Hartford Steam Boiler Inspection and Insurance Company. A controlling interest in Hartford was owned by International Telephone and Telegraph Corporation, which acquired M & M within the year. The subject of the lawsuit involved a letter drafted by the Society claiming that a device such as the Hydrolevel device was unsafe. M & M seized upon the letter to discourage customers from buying Hydrolevel's product. The proofs established that there was no basis for such an opinion and that the M & M and Hartford Vice–Presidents played instrumental roles in the drafting of the letter in their respective positions as Vice–Chairman and Chairman of the subcommittee. Grounding its holding in the doctrine of apparent authority, the Supreme Court found the Society liable for the anti-competitive acts of it agents.

Chairman in violating the Sherman Act); *First Alabama Bank v. First State Ins. Co.*, 899 F.2d 1045 (11th Cir.1990) (recognizing rule that constructive knowledge is imputed to principal to avoid the injustice of the principal being shielded from liability which would ensue from such knowledge or notice, but finding knowledge of bank's insurance agent could not be imputed to bank under the facts of the case); *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407 (7th Cir.1988) [7] (recognizing that "where a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal must accept the consequences of the agents's misconduct because it was the principal who allowed the agent to operate without accountability"). The Court does not take issue with plaintiff's statement of the law of agency. The cases upon which plaintiff relies, however, do not involve the threshold issue before this Court, namely whether or not an agency relationship is in existence.

For instance, in *Hydrolevel, supra,* the status of the Chairman and Vice–Chairman of the subcommittee as agents was not disputed. The relevant issue in *Hydrolevel* was whether the Society's "liability under a theory of apparent authority was consistent with the intent behind the anti-trust laws." *Hydrolevel,* 456 U.S. at 570, 102 S.Ct. at 1944. In *Cicero, supra,* there was no issue of whether the Senior Vice–President and Loan Officer of the bank was an agent of the bank. The question in *Cicero* was first whether the "adverse agent" exception [8] operated to pre-

clude the imputation of the agent's lack of good faith to the bank. *Cicero,* 860 F.2d at 1417. Assuming the adverse agent exception applied, the second question was whether the "sole actor" exception to the exception [9] applied nevertheless requiring the imputation of the agent's lack of good faith to the bank. *Id.* at 1417–18. Thus, plaintiff's cases are factually distinguishable and generally inapplicable to the core issue before the Court of whether or not an agency relationship exists between WCPI and the sales representatives.

In addition to the above-cited cases, AT & T points to cases involving copyright infringement for the proposition that a principal can be held liable for the acts of his agents which infringe another's intellectual property rights. *See* Whitmer Letter at 13–15 (citing *Gershwin Publishing Corp. v. Columbia Artists Mgt., Inc.,* 443 F.2d 1159 (2d Cir.1971) and *F.E.L. Publications LTD. v. National Conference of Catholic Bishops,* 466 F.Supp. 1034 (N.D.Ill.1978) [hereinafter "*NCCB* "] ). First, the Court notes that vicarious liability for trademark infringement, has been recognized as more narrowly drawn than that for copyright infringement. *See Hard Rock Cafe,* 955 F.2d at 1150 (citing *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 787 n. 19, 78 L.Ed.2d 574 (1984) for the proposition that "secondary liability for trademark infringement should ... be more narrowly drawn than secondary liability for copyright infringement"). The United States Supreme Court has recognized that " 'trademark right

7. In *Cicero,* a bank commenced an action to recover certain bond and stock certificates that it accepted as collateral for loans. The bank later discovered that the certificates were stolen from the various defendants and the certificates were subsequently confiscated by the FBI. The bank claimed that it was the bona fide purchaser ("BFP") of the certificates and thus had superior rights to the certificates. As a requirement to BFP status, the bank was required to establish that it was without notice of any adverse claims at the time of acceptance of the certificates. William Giova, a Senior Vice–President of the bank and Senior Loan Officer, represented the bank in connection with the loans secured by the certificates. Apparently, a proper inquiry by Giova into the Securities and Exchange Commission's computer data base, the Securities Information Center ("SIC"), would have revealed that

a portion of the certificates had been stolen. Giova subsequently pleaded guilty to two counts of a multi-count indictment charging him with, *inter alia,* conspiracy to knowingly transport stolen securities in interstate commerce.

8. The adverse agent exception is invoked where the agent's interests are shown to be adverse to the principal. *Cicero,* 860 F.2d at 1407. "It is then presumed that such an agent is unlikely to fulfill his fiduciary duty of full disclosure to the principal." *Id.*

9. The sole actor exception to the exception provides that "where an adverse agent is also the *sole* representative of the principal in the transaction in question, the principal may once again be charged with the agent's knowledge." *Cicero,* 860 F.2d at 1417.

has little or no analogy" to copyright or patent." *Sony,* 464 U.S. at 439 n. 19, 104 S.Ct. at 787 n. 19. Accordingly, the Court declines to place any reliance on plaintiff's copyright cases.

In any event, the holding's in plaintiff's cases are not inapposite. In *Gershwin,* an examination of the relationship between the "vicarious/contributory" infringer and the "primary" infringer reveals a close working relationship between the parties where the vicarious infringer had "pervasive participation in the formation and direction" of the primary infringer's operation. *Gershwin,* 443 F.2d at 1163. In fact, the court found that the vicarious infringer had knowledge of the infringing acts, *id.* at 1162–63, and as it believed it had no responsibility for any infringement that might occur, it took no steps obtain the proper copyright clearance. *Id.* at 1161. WCPI's involvement with the sales representatives does not even begin to approach the degree of pervasiveness as that of the vicarious infringer in *Gershwin.*

In *NCCB,* the court found that plaintiff had failed to produce sufficient proofs of direct involvement on the part of the dioceses in the alleged infringing acts of the individual church parishes. In distinguishing the *Gershwin* case, the *NCCB* court recognized that in *Gershwin,* plaintiffs were able to show that the "vicarious" infringer was "involved in every aspect of the planning and production of the infringing performances." *NCCB,* 466 F.Supp. at 1042. In this Court's view, Inga and WCPI's relationship with it sales representatives is more akin to the relationship between the parties in *NCCB* than in *Gershwin.* Although the *NCCB* court also relied upon the fact that NCCB received no financial benefit from the infringing acts, this Court is not persuaded that WCPI's direct financial benefit from the acts of the sales representatives requires a different outcome in this case. The fact remains that WCPI, like NCCB, is not so directly involved, and practicably cannot be so directly involved, with the operations of the primary infringers so as to warrant the imposition of vicarious liability on WCPI and Inga.

Accordingly, for all of the reasons discussed above, the Court finds that the sales representatives are independent contractors whose misconduct cannot be imputed to WCPI and Inga.

### 3. Likelihood of Confusion

■ The Court need not rest solely on its determination that the sales representatives are independent contractors in denying plaintiff's application. To succeed on its trademark infringement claim, one of the elements that plaintiff must establish is that as a result of the infringing acts, consumers are likely to confuse the source of plaintiff's product with that of defendants' product. There is no question that plaintiff submitted sufficient proofs to the Court to establish that consumers have been confused by certain oral misrepresentations made by and written documents provided by the Winback sales representatives. However, the proofs also establish that the cause of such confusion is not solely attributable to the sales representatives.

For instance, the nature of the product itself gives rise to some degree of the confusion. This is not a case where the product is a so-called "knock-off", such as imitation Hard Rock Cafe T–Shirts. WCPI's product is the access to the real thing, the actual AT & T network. Inga's uncontroverted testimony established that not only is access to the network provided, but that in many cases, via the execution of a letter of agency, the end user finds him or herself with virtually the same telephone product and services from AT & T as he or she would have as a direct customer of AT & T. Thus, confusion is a natural incident of the product itself.

In addition, the record suggests that certain actions attributable to AT & T and those who acted on behalf of AT & T also played some role in the creation of the confusion. At the hearing on plaintiff's application for both the TRO and the preliminary injunction much was made about the confusion resulting from the name Winback and Conserve Program, Inc. However, the uncontroverted testimony of Inga established that prior to establishing and incorporating WCPI he received authorization from his AT & T account representative, Joseph Fitzpatrick to use the

name Winback & Conserve Program, Inc.[10] *See* Inga Certif. 12/15/93 at ¶ 4; Transcript of Proceeding 3/2/94 at 6:6–9:17.

Furthermore, the evidence established that the transfer form and main billed form are provided by AT & T to all aggregators. Transcript of Proceedings 3/1/94 at 80:13–14; 81:23–25; Inga Certif. 12/15/93 at ¶¶ 8, 16 & Exhibit A; Inga Certif. 2/15/94 at ¶ 8–9. Apparently, without the completion of such forms AT & T will not process the transfers. The transfer form, as it was originally provided to the aggregators, including WCPI, contained at the top of the page the AT & T initials and the AT & T globe symbol. Inga testified that it was only by letter dated October 13, 1993 that AT & T instructed all of its aggregators to stop using the transfer form with the AT & T logos and to replace it with the transfer form without the logos. Although the proofs also established that the forms were used by some representatives subsequent to that instruction, the fact remains that AT & T first put the document in use in its objectionable form. Significantly, many of the end users who claimed that they believed they were dealing with AT & T cited to the transfer form with the AT & T logos as one of the bases for their beliefs.

The Court does not intend to suggest, however, that either the nature of the product or the arguably unwise decisions of the AT & T marketing department would justify acts of infringement by WCPI or those who market the WCPI product. Indeed, the Court makes no determination as to the primary cause of the actual confusion which was proven to exist. The Court only raises these issues to support its conclusion that the issuance of a preliminary injunction in this matter, which would require a finding of likelihood of confusion, would be improper given that certain decisions by the plaintiff played at least some substantive role in the creation of the confusion. *Cf. Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1475 (D.N.J.1985).

## B. Other Equitable Considerations

It has been said that "[t]here is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case than the issuing [of] an injunction." *Falter v. Veterans Administration*, 632 F.Supp. 196, 201 (D.N.J.1986) (quotations omitted). The power to issue an injunction is "the strong arm of equity." *Id.* This being the case it is essential that the equitable factors which influenced the Court's decision be addressed.

The Court finds significant the uncontroverted testimony and documentary proof that in the instances where plaintiff brought objectionable acts of the sales representatives to the attention of Inga, Inga took appropriate steps to reprimand and discipline the sales representative.[11] *See, e.g.,* Inga

---

10. Concededly, much of AT & T's concern is that many of the Winback marketing representatives use the name without the "Inc." appellation. In fact, one of the restraints set in place by this Court's TRO was that all marketing materials designate WCPI as Winback & Conserve Program, Inc. The purpose of this order was to ensure that WCPI was clearly identified as its own corporate entity without any affiliation to AT & T. Even with the use of the "Inc.", however, it is conceivable, and in this Court's view quite possible, that the name would still give rise to confusion in the mind of the consuming public as to whether or not the program was affiliated with AT & T. Furthermore, it is surely foreseeable that WCPI would be referred to casually without the "Inc." as it is common practice in everyday discussions to refer to companies and entities without including any appellation such as Inc., Co., P.A. etc. In fact, AT & T itself referred to WCPI as "Winback & Conserve Program" in a monthly paycheck/credit statement

sent to WCPI as recently as February of 1994. Transcript of Proceedings 3/2/94 at 10:4–13; Defendants' Ex. 3, admitted in evidence at the hearing on plaintiff's preliminary injunction application.

11. Plaintiff argues that the fact that Inga takes such steps, and believes that it is his responsibility to take such steps, is evidence of a principal/agent relationship. In this Court's view, however, such actions do not create an agency relationship, but merely operate as a defense to liability for contributory infringement. Liability for contributory infringement arises when "a manufacturer or distributor intentionally induces another to infringe a trademark, or it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). Thus, if Inga did not take such steps and continued to

Certif. 12/15/93 at ¶ 10; Inga Certif. 2/15/94 at ¶¶ 5, 9, 10, 11, 13; Transcript of Proceedings 3/1/94 at 29–34, 79–80 & Defendants' Exhibit 1 admitted into evidence at the hearing; Certification of Joseph Feroli at ¶¶ 8–9 (recognizing his error and acknowledging that his superior admonished his use of a certain document).

Furthermore, unlike the *Hydrolevel* case, relied upon by plaintiff, where the Court determined that the Society was in the best position to prevent acts of anti-competitive behavior among its committee members, *see Hydrolevel*, 456 U.S. at 572, 102 S.Ct. at 1945, the testimony in this case established that the WCPI product was marketed through a sprawling web of sales representatives either employed by or under contract with the individual sales/marketing agencies. Inga testified that "[d]ue to the fact that it takes several months to a year or two to get your residuals up to a point where you can make a living," it is not economically practicable to have salaried sales persons on staff. *See* Transcript of Proceedings 3/1/94 at 63. Thus, in order to remain competitive, Inga utilizes independent agencies to perform the marketing aspect of the business. Inga and Salzano, the President of one such marketing agency, testified that most aggregators market through these agencies and that the agencies market on behalf of many aggregators.

Given this structure with multiple levels of sales representatives over whom Inga has no control, making voluminous numbers of solicitations on a daily basis, it is hard to imagine what more AT & T would have Inga do to prevent these independent agencies from engaging in objectionable marketing tactics in the first instance. In this regard, the Court reiterates and stresses that there has been insufficient proof placed before it at this time to support a claim that Inga induced the acts of infringement, was wilfully blind to the acts of infringement, or was negligent in not preventing the acts of infringement. In fact, the uncontroverted proofs offered by defendants

indicate that Inga took steps to direct the sales agencies not to misrepresent the origin of the product. Furthermore, defendants established that in instances where Inga was informed of objectionable representation, Inga dealt swiftly and appropriately with the sales representatives engaging in the such acts. Without sufficient evidence to establish that Inga was aware of, encouraged, ratified or participated in the acts of infringement, it would be difficult for this Court to justify the imposition of preliminary restraints against Inga and WCPI.

Finally, the Court notes that AT & T is not left without an effective avenue of relief. AT & T remains free to pursue preliminary injunctive relief against the sales/marketing agencies which develop the marketing material and employ or contract the representatives that are engaging in the allegedly misleading practices.

## IV.  CONCLUSION

The Court has concluded that at this stage in the litigation plaintiff has not established a likelihood of success on the merits. Thus, it is not necessary to consider whether plaintiff has satisfied its burden of proving irreparable harm, nor is it necessary to address the additional elements of public interest and the possibility of harm to others.

Accordingly, for all of the foregoing reasons, plaintiff's application is **DENIED.** The Court expresses no opinion at this time as to the ultimate success of plaintiff's cause of action at trial. The parties should not rely upon comments expressed in this opinion to preclude the Court from revisiting any issues which may arise at the time of final hearing when the Court will have the advantage of reviewing a more fully developed testimonial and documentary record.

An appropriate Order will issue.

## ORDER

This matter having come before the Court on plaintiff's application for a preliminary

---

supply his product to the marketing agencies for distribution, plaintiff undoubtedly would be arguing that Inga and WCPI were contributory infringers. Inga and WCPI, having taken prudent steps to arguably avoid liability as contributory

infringers, plaintiff may not now come before the Court and argue that such actions form the basis on which Inga and WCPI can be held vicariously liable for the acts of the sales representatives.

injunction, and the Court having reviewed the submissions of the parties, and having conducted a hearing thereon, and for the reasons more fully explained in the accompanying Letter Opinion dated May 12, 1994, and for good cause shown,

**IT IS** on this ____ day of May, 1994

**ORDERED** that plaintiff's application for a preliminary injunction be and hereby is **DENIED.**