**MINI MAID SERVICES COMPANY,**
**Plaintiff–Appellee,**

v.

**MAID BRIGADE SYSTEMS, INC. and**
**Donald Maxwell Hay, Defendants–**
**Appellants.**

**No. 91–8475.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 7, 1992.

George B. Haley and William H. Brewster, Kilpatrick & Cody, Atlanta, Ga., for defendants-appellants.

D. Glenn Brock, Brian J. Morrissey, and Bonnie L. Wilson, Brock & Clay, Marietta, Ga., for plaintiff-appellee.

Before HATCHETT and BIRCH, Circuit Judges, and MORGAN, Senior Circuit Judge.

BIRCH, Circuit Judge:

In this case we decide whether a franchisor can be held liable for a single act of trademark infringement allegedly committed by one of its many franchisees. The United States District Court for the Northern District of Georgia directed a verdict against the defendant franchisor because it failed to exercise "reasonable diligence" to prevent its franchisee from violating the trademark laws. We find the district court's "reasonable diligence" test for vicarious trademark liability to be an incorrect legal standard and accordingly VACATE the judgment of the district court.

I.

The defendant, The Maid Brigade Systems, Inc. ("Maid Brigade"), and the plaintiff, The Mini Maid Services Company, Inc. ("Mini Maid"), are both franchisors of residential cleaning service businesses. Maid Brigade owns the federal registration for the service mark MAID BRIGADE and Mini Maid owns the registration for the mark MINI MAID. Both companies li-

cense the use of their marks through franchise agreements. Maid Brigade has 70 franchises in 100 territories; Mini Maid has 52 franchises in 115 territories.

The dispute in this case stems from the conduct of two franchisees located in southern California. In the fall of 1989, a Maid Brigade franchise operated by Bert and Carol Carpenter (the "Maid Brigade franchisee") purchased certain assets from a Mini Maid franchise operated by David and Susan Garland (the "Mini Maid franchisee") that happened to be closing. The transfer agreement between the Maid Brigade franchisee and the Mini Maid franchisee specified that the Carpenters would acquire certain assets from the Garlands, including their customer list, several automobiles, their lease on office space, and the telephone number connected to that office space.

It was the transfer of the telephone number that generated the trademark issue in this case. The telephone number transferred by the Mini Maid franchisee was associated with a classified or "yellow pages" advertisement bearing the MINI MAID service mark. The Mini Maid franchisee placed this advertisement sometime before the asset transfer. After the transfer of the office space and the telephone number to the Maid Brigade franchisee, it was still possible that potential purchasers of maid services would locate the advertisement bearing the MINI MAID mark and call the number listed therein. Such a customer, of course, would actually reach the Maid Brigade franchisee.

Mini Maid learned that an advertisement bearing its registered mark could be benefitting a competitor in October of 1989. Shortly thereafter, Mini Maid contacted Maid Brigade and its president, defendant Donald Maxwell Hay, to request that Maid Brigade stop its franchisee from using the disputed telephone number. Although the subsequent efforts taken by Maid Brigade and Mr. Hay are in dispute, the record indicates that Hay had several conversations with the Carpenters about the wisdom of using a telephone number that was associated with a competitor's trademark. Hay also contemplated the possibility of terminating the Carpenter franchise, concluding on the advice of counsel that such a course of action could subject the Maid Brigade franchisor to liability for wrongful termination of a franchisee.

## II.

Mini Maid filed suit for trademark infringement in November of 1989. However, Mini Maid did not sue the seller of the disputed telephone number (the Mini Maid franchisee), or the buyer and user of the disputed telephone number (the Maid Brigade franchisee). Instead, Mini Maid sued franchisor Maid Brigade and its president Hay, contending that both were liable for *failing to prevent* the trademark infringement allegedly committed by the Maid Brigade franchisee. In February 1990, the district court entered a preliminary injunction (without granting a hearing) directing that the telephone number be disconnected. The number was subsequently disconnected in June 1990, about a month before Mini Maid posted the required injunction bond in July.

The case was eventually tried before a jury in April 1991. At the conclusion of the evidence, the district court directed a verdict against Maid Brigade and Hay on the issue of their liability for trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (1988).[1] In finding infringement by the Maid Brigade franchisee, the court stated:

> I will bring up the plaintiff's motion for a determination that there was an infringement. I think the evidence demands that. I think that when a telephone number that is advertised by one concern as being their number is taken over by another concern that answers the phone

---

**1.** The district court also directed a verdict against the plaintiff on the seven other counts asserted in the plaintiff's complaint. Mini Maid does not appeal this ruling.

using a similar name, that there is a likelihood of confusion. And I will tell the jury that. I will tell them that a violation has been proven, that they are to determine the amount of the award. R7–339. As for the franchisor's liability for the individual acts of its franchisee, the court ruled that "a franchisor may be held liable for its failure to exercise reasonable diligence to prevent a franchisee from violating the trademark laws." R3–46–8. The court found that the defendants had been less than diligent because they neither exercised their purported contractual control over the disputed telephone number nor threatened to terminate the Carpenter franchise after discovering that the Carpenters might be violating the trademark laws.

After directing a verdict against the defendants on liability, the district court proceeded to an analysis of damages. The court found no evidence of actual damages and therefore directed a verdict against the plaintiff on its claim for actual damages. However, the court concluded that Mini Maid could still recover the amount of the defendants' profits that resulted from the alleged infringement, as well as the costs of the action. See 15 U.S.C. § 1117 (1988). Using the jury in an advisory capacity on this issue, the district court ultimately concluded that Mini Maid was entitled to recover from the defendants over $70,000.00 in profits, costs, and attorneys' fees.

### III.

■ By premising a franchisor's liability for trademark infringement upon the franchisor's purported duty to supervise with reasonable diligence, the district court committed legal error. The law imposes no duty upon a franchisor to diligently prevent the independent acts of trademark infringement that may be committed by a single franchisee. Ordinarily, when a franchisee

violates the trademark laws in this manner, the franchisee itself is responsible for the infringement, and may be held accountable by the owner of the infringed mark. But the franchisor may not instead be held liable for the franchisee's infringement solely because the franchisor failed to exercise reasonable diligence to prevent the violation.

■ It is true that the law imposes a duty upon a licensor (such as a franchisor) to supervise a licensee's use *of the licensor's own trademark.* E.g., Ron Matusalem & Matusa, Inc. v. Ron Matusalem, *Inc.,* 872 F.2d 1547, 1551 (11th Cir.1989). Such a duty of supervision derives from the Lanham Act's abandonment provisions, which specify that a registrant's mark may be canceled if the registrant fails to control its licensees' use of the licensed mark. *See, e.g.,* 15 U.S.C. § 1064(5)(A) (1988). This duty to supervise a trademark licensee exists to protect the public from being misled about the quality or consistency of the products offered under the licensor's trademark. By requiring a licensor to supervise a licensee's use of its own mark and to some extent a licensee's operations under that mark, the law attempts to ensure that the public will not be deceived when purchasing goods and services that relate to that trademark. *See, e.g., Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 387 (5th Cir.1977).[2] As one of the leading cases in this area explained:

> Without the requirement of control, [licensing] would create the danger that products bearing the same trademark might be of diverse qualities. If the licensor is not compelled to take some reasonable steps to prevent misuses of his trademark in the hands of others the public will be deprived of its most effective protection against misleading uses of a trademark.... [U]nless the licensor exercises supervision and control over

---

2. *See also* Scott P. Sandrock, *Tort Liability of a Non–Manufacturing Franchisor for Acts of its* *Franchisee,* 48 U.Cin.L.Rev. 699, 705–06 (1979).

**1520**

the operations of its licensees the risk that the public will be unwittingly deceived will be increased....

*Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir.1959) (citations omitted).

██ But the licensor's duty to control a licensee's use of *the licensor's own trademark* cannot be blindly converted into a duty to prevent a licensee's misuse of *another party's trademark.* Such a wholesale conversion would impose responsibility upon a franchisor not for failing to maintain the integrity of its own trademark, but for failing to prevent another entity's violation of the law. We can discern no reason to impose such a burden upon a party that is, at best, secondarily responsible for any trademark infringement. As the Seventh Circuit has held:

> The purpose of the Lanham Act, however, is to ensure the integrity of registered trademarks, not to create a federal law of agency. Furthermore, the scope of the duty of supervision associated with a registered trademark is commensurate with this narrow purpose. The duty does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question. It does not automatically saddle the licensor with the responsibilities under state law of a principal for his agent.

*Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1327 (7th Cir.1979); *see also* *Burkert v. Petrol Plus, Inc.*, 216 Conn. 65, 579 A.2d 26, 32 (1990) ("[T]he sole consequence of a trademark owner's failure to exercise control over its licensees is the potential loss of the rights associated with the trademark.... [A] trademark owner's failure to exercise control [does not] subject[ ] the owner to affirmative liability in tort...."). Thus, although the law imposes upon a franchisor the duty to police the use of its own mark, a franchisor has no similar legally-imposed duty to police a franchisee's appropriation of other marks.[3]

Nor can a franchisor's duty of "reasonable diligence" to prevent its franchisee from committing trademark infringement be found, as the district court believed, in *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529 (11th Cir.1986). *Sizzler* was a case addressing contempt of court, not vicarious liability for trademark infringement. In *Sizzler*, the district court had entered a consent judgment requiring *both franchisor Western Sizzlin and Western Sizzlin's franchisees* to cease certain activities that were infringing upon Sizzler Family Steak Houses's trademark. *Id.* at 1532–33. When Western Sizzlin and its franchisees failed to fully comply with the terms of the court's judgment, Sizzler Family Steak Houses moved to hold Western Sizzlin in contempt. After Western Sizzlin admitted numerous violations of the court order, the district court granted the contempt motion and imposed sanctions. This court affirmed. *Id.* at 1535–37.

In affirming the district court's finding of contempt, we stated that franchisor

---

3. In finding that Maid Brigade had the power, as well as the duty, to supervise the Maid Brigade franchisee's use of the disputed telephone number, the district court noted that the "franchise contract with the Maid Brigade Franchisee ... states that '[t]he Franchisee acknowledges that as between the Franchisor and the Franchisee, the Franchisor has the sole right to, and interest in, all telephone numbers and directory listings associated with the trademark.'" R3–46–8 (district court emphasis omitted) (quoting the Maid Brigade/Carpenter Franchise Agreement, ¶ 15C, at 21). But this contract provision actually supports the distinction between a franchisor's duty to supervise the use of its own trademark and a franchisor's duty to supervise the misuse of another party's trademark. Read in context, it is clear that this provision of the franchise agreement was intended to allow Maid Brigade to control the franchisee's use of "'all telephone numbers and directory listings *associated with the [MAID BRIGADE] trademark.'"* *Id.* Consistent with the duty of supervision imposed by the Lanham Act, Maid Brigade was attempting to police a licensee's use of its own MAID BRIGADE mark. The provision did not purport to police any potential misuse of an advertisement or phone number associated with a competitor's mark.

Western Sizzlin was responsible for the infringing actions of its franchisees because Western Sizzlin did not exercise "reasonable diligence" in attempting to comply. *Id.* at 1537. But Western Sizzlin's duty of reasonable diligence was imposed not simply because Western Sizzlin was a franchisor, but because *Western Sizzlin was a party to a court order requiring that Western Sizzlin and its franchisees halt the previous infringing activity.* Because "[e]ach party to a court order is responsible for ensuring its own compliance with that order and for shouldering the cost of compliance," *id.* at 1535, we held that Western Sizzlin could be fined for contempt because it did not make all reasonable efforts to achieve compliance. *Id.* at 1537.

▮ The duty of "reasonable diligence" announced in *Sizzler* does not apply to this case. Maid Brigade and its franchisees were not parties to a court order requiring that infringing activities against Mini Maid cease. Nor was Maid Brigade required by court order to prevent the Maid Brigade franchisee's purchase of the Mini Maid franchisee's telephone number, on pain of contempt. In fact, no contempt motion has ever been filed against Maid Brigade, and the Maid Brigade franchisee has never been a party to this case. Moreover, the evidence demonstrated that Maid Brigade and Hay were not aware of the specifics of the California asset transfer until after consummation of the deal. For these reasons, the duty of reasonable diligence that was imposed in *Sizzler* upon adjudicated wrongdoers and potential contemnors did not apply to either Maid Brigade or Hay. Even if a franchisor that fails to prevent the contemptuous acts of many franchisees may be found liable for a contempt fine, it does not follow that every franchisor who fails to prevent a franchisee's single act of infringement can be held liable for substantive trademark infringement. Accordingly, we hold that although the Lanham Act and *Sizzler* require a franchisor to control its own trademark and to comply with court orders,

these duties do not subject a franchisor to liability for a franchisee's infringement of another's trademark based upon the franchisor's failure to supervise its franchisee with "reasonable diligence."

## IV.

▮ Although a franchisor may not be held liable for a single franchisee's infringement solely because the franchisor failed to exercise reasonable diligence to prevent the violation, a franchisor might be liable for contributory trademark infringement, even if the franchisor did not itself perform any infringing acts. In *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), the Supreme Court considered whether a manufacturer of drugs could be liable for trademark infringement under the Lanham Act, even though it was independent pharmacists (and not the manufacturer) who were committing the infringing acts. The Court held:

> [L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another. Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially [sic] responsible for any harm done as a result of the deceit.

*Inwood Lab.*, 456 U.S. at 853–54, 102 S.Ct. at 2188; *see also Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1356 n. 4 (11th Cir.1983).

▮ Although *Inwood Laboratories* involved the relationship between manufacturers and retailers, the analysis employed in that case governs the relationship between a franchisor and its franchisees.

Following the lead of *Inwood Laboratories,* we conclude that liability for trademark infringement can extend beyond those entities that actually perform the acts of infringement, but only under certain circumstances. With respect to a franchisor's liability for the independent infringing acts of its franchisees, we hold that the franchisor may be held accountable only if it intentionally induced its franchisees to infringe another's trademark or if it knowingly participated in a scheme of trademark infringement carried out by its franchisees. *Cf. Inwood Lab.,* 456 U.S. at 853–54, 102 S.Ct. at 2188.

As in *Inwood Laboratories,* any liability for contributory infringement will necessarily depend upon whether or not the contributing party intended to participate in the infringement or actually knew about the infringing activities. *See* 456 U.S. at 853–55, 102 S.Ct. at 2188–89; *David Berg and Co. v. Gatto Int'l Trading Co.,* 884 F.2d 306, 311 (7th Cir.1989); *Sealy, Inc. v. Easy Living, Inc.,* 743 F.2d 1378, 1382 (9th Cir.1984). In making these determinations of intent and knowledge, a district court should consider the nature and extent of the communication between a franchisor and its franchisees regarding the infringing acts; specifically, the court should decide whether or not the franchisor explicitly or implicitly encouraged the trademark violations. *See, e.g., William R. Warner & Co. v. Eli Lilly & Co.,* 265 U.S. 526, 530, 44 S.Ct. 615, 617, 68 L.Ed. 1161 (1924); *Coca–Cola Co. v. Snow Crest Beverages, Inc.,* 64 F.Supp. 980, 988–89 (D.Mass.1946), *aff'd,* 162 F.2d 280, 285 (1st Cir.), *cert. denied,* 332 U.S. 809, 68 S.Ct.

110, 92 L.Ed. 386 (1947). In addition, the court may wish to consider the extent and nature of the violations being committed. If the infringement is serious and widespread, it is more likely that the franchisor knows about and condones the acts of its franchisees. Finally, under appropriate facts, contributory trademark infringement might be grounded upon a franchisor's bad faith refusal to exercise a clear contractual power to halt the infringing activities of its franchisees.[4]

## V.

In this case, the district court did not apply the correct legal standard in determining that Maid Brigade and Hay were liable for the infringement allegedly committed by the Maid Brigade franchisee. The court focused upon whether or not the defendants supervised their franchisee with reasonable diligence, instead of whether or not the defendants intentionally induced infringing acts or actively participated in any infringement scheme. The district court's conclusions, while erroneous, were nevertheless understandable given the lack of direct precedent governing the circumstances of this case. Nevertheless, in light of the district court's legal error, the judgment, damages and costs awarded to Mini Maid cannot stand.[5] Accordingly, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

---

4. Without the standards we announce today, the combination of a renegade franchisee and an ambiguous franchise agreement might leave a franchisor in a very difficult position. Maid Brigade alleges that it was placed in such a position in this case: "Maid Brigade and Don Hay were unknowing victims placed between the proverbial rock and a hard place—squeezed by a runaway franchise that would not respond to its repeated requests, a telephone company that would not take action on its behalf, advice from its counsel that termination of the franchisee would be inappropriate, and, finally, a

competitor seeking vengeance after a long, acrimonious history." Appellants' Reply Br. at 4.

5. Given our disposition of this case, we express no opinion on the other challenges to the district court's award of profits, costs, and attorneys' fees. We also do not decide whether the conduct of the Maid Brigade franchisee constituted trademark infringement within the meaning of the Lanham Act.