LUXOTTICA GROUP, S.P.A., an Italian Corporation, and Oakley, Inc., a Washington Corporation, Plaintiffs,

v.

AIRPORT MINI MALL, LLC, a Georgia Limited Liability Company doing business as Old National Discount Mall, Yes Assets, LLC, a Georgia Limited Liability Company, Chienjung Yeh, also known as Jerome Yeh, and Donald Yeh, Individually, Defendants.

CIVIL ACTION NO. 1:15–cv–1422–AT

United States District Court,
N.D. Georgia, Atlanta Division.

Signed 02/10/2017

David Rosemberg, George G. Mahfood, Broad and Cassel, PL, Miami, FL, John David Farrish, Quintairos, Prieto, Wood & Boyer, P.A., Rachel R. Krause, Lewis, Brisbois, Bisgaard & Smith, LLP, Atlanta, GA, for Plaintiffs.

Louis Emerson Bridges, Law Office of Louis E. Bridges LLC, Melissa Cordell Patton, Andrei Vlad Ionescu, Marvin Dewayne Dikeman, Webb Zschunke Neary & Dikeman, LLP, Daniel J. Huff, Huff Powell & Bailey, LLC, Atlanta, GA, Robert

Usher Wright, Katz Stepp Wright & Fleming, LLC, Decatur, GA, for Defendants.

## ORDER

Amy Totenberg, United States District Judge

This matter is before the Court on Defendants' Second Motion in Limine [Doc. 108] seeking to exclude evidence or arguments from Plaintiffs regarding: (a) sales or purchases involving tenants other than those identified in Plaintiffs' notice letter; (b) seizures of counterfeit goods before Defendants received Plaintiffs' notice letter; and (c) alleged sales or seizure of goods other than Ray–Ban or Oakley sunglasses. The Court held a Pretrial Conference on February 3, 2017, and heard argument from the parties. In particular, Defendants challenge the admissibility of evidence of other counterfeit sales at the Discount Mall prior to 2009, when Defendants contend they began operating the Discount Mall. The Court deferred ruling on Defendants' Second Motion in Limine and asked the parties to submit additional materials for consideration.

## I. BACKGROUND

Luxottica manufactures, markets, and sells premium, luxury and sports eyewear under various proprietary trademarked brands including Ray–Ban and Oakley. Luxottica does not offer its merchandise for sale through individuals, street vendors, unauthorized retail locations, or flea markets. According to its Complaint, Luxottica operates over 7,000 retail stores, including LensCrafters, Pearle Vision, and Sunglass Hut. Defendants are each alleged to be owners and operators of the Old National Discount Mall (also referred to as the International Discount Mall), an indoor "flea market" near the Atlanta airport in College Park, Georgia. Luxottica asserts that certain vendors at the Discount Mall have sold and continue to sell an array of counterfeit goods, including "knock-off" Ray–Ban and Oakley sunglasses.

Luxottica's trademark-investigators, third party investigators, and federal and state law enforcement agencies visited the Discount Mall numerous times in the past several years to conduct undercover surveys, purchase counterfeit merchandise, or participate in seizures carried out by law enforcement agencies. On November 13, 2014, Luxottica's investigator visited the Discount Mall and observed multiple vendors displaying in plain view counterfeit Ray–Ban and Oakley merchandise for sale.

On November 21, 2014, officers from the United States Department of Homeland Security and the College Park Police Department raided the Discount Mall and seized thousands of counterfeit products, including counterfeit Ray–Ban and Oakley merchandise. The raid resulted in the arrest of 16 vendors.

Luxottica's investigators visited the Discount Mall, observed sales of fake Ray–Bans and Oakleys and made purchases themselves of several pairs of counterfeit sunglasses for around $15.00 to $20.00 on multiple undercover trips in November 2014, March, 2015, April 2015, and October 2015. Luxottica sent cease and desist letters to the Discount Mall on December 9, 2014 and April 22, 2015, notifying them that tenants at the Discount Mall were trafficking in counterfeit Ray–Ban and Oakley merchandise.

Luxottica filed suit on April 29, 2015, seeking to hold Defendants as the owners and operators of the Discount Mall contributorially liable pursuant to the Lanham Act, 15 U.S.C. § 1114, for the infringing acts of the individual vendors directly engaged in selling the counterfeit merchandise.

A brief discussion of contributory liability principles provides helpful context for the Court's discussion of the facts and

evidence below. Liability under the Lanham Act "extends beyond direct violators of the trademark." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1276 (11th Cir. 2015) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)); *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992) (holding that under certain circumstances, "[l]iability for trademark infringement can extend beyond those entities that actually perform the acts of infringement") (citing *Inwood* ("Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one who it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.")) ). Several courts have extended liability for contributory trademark infringement to owners and operators of flea markets and other locations where multiple individual vendors come together to sell counterfeit goods. *See, e.g., Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149–1150 (7th Cir. 1992) (applying *Inwood* liability test for contributory trademark infringement to find that the owner and operator of a flea market may be subject to contributory liability where counterfeit items were sold and finding that owner/operator, though lacking actual knowledge, had reason to know of trademark violations of its vendors and by "willfull blindness" deliberately failed to investigate suspected infringing activity by vendors, thereby facilitating ongoing infringement by permitting such vendors to use flea market resources); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264–265 (9th Cir. 1996) (adopting *Hard Rock Cafe's* application of contributory trademark infringement liability to operators of a swap meet who had reason to know of infringing activity after law enforcement officers raided the flea market and seized counterfeit merchandise); *Coach v. Goodfellow*, 717 F.3d 498 (6th Cir. 2013) (holding that facts were sufficient to support a finding of contributory liability as to flea market operator, as "provider of a product or service, i.e., rental booths and storage units for vendors" who "continued to rent spaces at his flea market to vendors that he knew, or should have known, were engaging in infringing activity"); *Coach Inc. v. Swap Shop, Inc.*, 916 F.Supp.2d 1271, 1279 (S.D. Fla. 2012) (holding that plaintiffs stated a plausible claim that owners and operators of a flea market were either willfully blind to Lanham Act violations or had actual knowledge of them, and were therefore liable for contributory trademark infringement, where prior police raids and seizures of counterfeit bags and other products had occurred, operator was notified of violations, and trademark holder had sent investigators to flea market); *Coach, Inc. v. Sapatis*, 994 F.Supp.2d 192 (D. New Hampshire 2014) (finding that the defendant's degree of control over the infringer—rather than his or her nominative status as owner, lessor, or lessee—as the determinative factor and denying motion for summary judgment of individual owner and operator of flea market where the evidence viewed in the light most favorable to Coach indicated he exercised sufficient control over the flea market and its vendors for a reasonable jury to hold him contributorially liable for the vendors' conduct).

## II. SUMMARY OF FACTS RELEVANT TO DEFENDANTS AND THEIR INVOLVEMENT WITH THE DISCOUNT MALL

Defendant Yes Assets, LLC, is a company owned by Defendants Jerome and Jenny Yeh and managed by the Yeh's daughter, Defendant Alice Jamison. Yes Assets owns the property where the Old National

Shopping Center (the "Shopping Center") is located. The Shopping Center is made up of an approximately 139,000 square foot strip mall with 31 outside store-fronts, a large anchor store containing the 79,000 square foot Old National/International Discount Mall (the "Discount Mall"), and a large parking lot. Yes Assets bought the property some time in 2004. At that time, the portion of the Shopping Center containing the Discount Mall was subject to a lease with Patrick Swindall for the "operation of a first class flea market 'mini-mall' or bazaar." (Doc. 124–2 at 2, 9.) Alice Jamison, on behalf of Yes Assets, managed the remainder of the Shopping Center beginning in 2004.

At the expiration of the lease with Patrick Swindall, Yes Assets leased the Discount Mall portion of the Shopping Center to Airport Mini Mall, LLC ("AMM") on December 1, 2009 for the purpose of operating "a discount shopping mall." (Doc. 59–3 at 4.) AMM is a company formed by Jerome Yeh with his son Donald Yeh serving as the sole member of the LLC. Donald and Jerome authorized Alice Jamison to act on behalf of AMM.[1]

Two versions of the lease between Yes Assets and AMM exist in the record.[2] The first version is signed by Jerome Yeh as President of Yes Assets and by Alice Jamison as Manager for AMM. (Doc. 59–3.) The second version is signed by Alice Jamison as Manager of Yes Assets and by Donald Yeh as Manager of AMM. (Doc. 72–5 at 37–60.)

The Defendants differentiate between the Shopping Center[3] (owned and operated by Yes Assets) and the Discount Mall (owned by Yes Assets[4] but operated by AMM[5]). The Discount Mall is one of many tenants in the Shopping Center. The Discount Mall is a tenant of Yes Assets while the individual vendors inside the Discount Mall are tenants of AMM. Despite this differentiation, the Court determined in its review of the summary judgment motion that the record shows an obvious intermingling of the various members of the Yeh family and the two companies regarding the ownership, operation, and management of both the Shopping Center and the Discount Mall.

In November 2009, Defendants hired Greg Dickerson to be the on-site manager and operator of both the Shopping Center and Discount Mall.[6] Greg Dickerson testified that when he was hired:

---

1. Alice Jamison is Jerome Yeh's daughter and Donald Yeh's sister.

2. The two leases also provide for different rent amounts and also define the "Premises" slightly differently. The first version designates the "Premises" as approximately "79,000 square feet within the Shopping Center" as shown an attached site plan, while the second version designates the "Premises" as approximately "78,800 square feet within the Shopping Center."

3. The Shopping Center is on the corner of Old National Highway and Godby Road. Some of the stores face Godby Road and some face Old National Highway.

4. Alice Jamison testified erroneously as to her belief that AMM "owns" the Discount Mall based on the corporate documents of AMM. AMM has held itself out as the owner of the Discount Mall on filings with the City of College Park, but the record demonstrates AMM operates the Discount Mall as a tenant. Defendant AMM may "own" the mall business, but it does not own the physical property on which the Discount Mall sits.

5. Dickerson reported to Jerome and his wife Jenny Yeh as well as Alice Jamison for issues related to the Shopping Center. And he reported to Donald Yeh, Alice Jamison, and Louis Bridges (the attorney) for issues related to the Discount Mall.

6. When Mr. Dickerson came on as the on-site property manager, he installed security cameras and hired a security company to monitor the parking lot and patrol the Discount Mall.

At the time, that right there was kind of the sideline of them hiring me as a property manager because what had happened at the mall, that's still part of the property, but it is identity by itself [sic. It is Airport Mini Mall. Airport Mini Mall had a building that was there that the tenants had been locked out of. Operating tenants that had businesses in there were locked out of the business and the mall was shut down.

(Dickerson Dep., Doc. 57–9 at 19.) Dickerson also testified that he was initially hired by Yes Assets but then "Airport Mini Mall stepped in due to the situation that was happening with the mall." (*Id.* at 20; 23 ("My understanding was that a lease was about to be up on the property and that at some point the Airport Mini Mall was going to fully control the, the mall.).) Other than Mr. Dickerson, no one from Yes Assets or AMM has an office at the Discount Mall. Instead, Yes Assets and AMM share office space in Doraville.

Alice Jamison testified as the 30(b)(6) representative for Yes Assets. She testified that Jerome Yeh created the company and asked her to manage the company and the Shopping Center for him when he purchased the property in 2004. Jamison's deposition testimony regarding her management duties does not differentiate between 2004 (when the property/Shopping Center was purchased) and 2009 (when AMM took over the lease of the portion of the Shopping Center containing the Discount Mall). Jamison testified that she signed leases on behalf of Yes Assets for tenants of the Shopping Center. There is no testimony from Jamison that she signed leases for tenants of the Discount Mall at any time. In addition to signing leases on behalf of Yes Assets, Jamison opens mail, collects rent, makes and answers calls, makes sure repairs are undertaken and completed, addresses tenants' questions, writes checks, and pays bills.

Although Jamison testified that she does not manage AMM or perform any services for AMM, she signed a version of the lease for the Discount Mall as Manager of AMM, and she is identified as the Manager and "Local Office Contact" for the Discount Mall on the Occupational Tax Certificate filed with the City of College Park in 2009. (Doc. 59–3; Doc. 72–5 at 5.) She also opens the mail for AMM, purchases office supplies for AMM, and handles most of the financial affairs of the company, including printing bank statements, maintaining the check register, writing and signing checks, receiving invoices, paying bills, and maintaining an accounts-payment log.

Jamison is a point of contact for Greg Dickerson for issues related to both the Shopping Center and the Discount Mall, including issues related to alleged counterfeiting activities of the tenants/vendors at the Discount Mall. Dickerson contacted Alice Jamison when the Discount Mall received letters in 2013 and 2014 from various merchandise brands regarding alleged sales by its tenants of counterfeit goods, including Louis Vuitton, Coach, Luxottica and Oakley. Despite receiving the notices from these companies, Jamison testified she was surprised when Dickerson called to inform her on November 21, 2014 that the Discount Mall had been raided by law enforcement, that counterfeit merchandise had been seized from its tenants, and that several tenants had been arrested:

> I couldn't believe it. I didn't know why it was happening. I thought it was the previous manager there, Mr. Swindle [sic], that had—that had—not started—I don't know what word I'm looking for—that had caused this to happen. That's what I thought.

(Yes Assets 30(b)(6) Dep. at 102–104.) However, at the time of the raid, Mr. Swindall had not been associated with the Discount Mall since AMM took over in late

2009. Jamison claimed that each time she received a letter regarding the sale of counterfeit goods at the Discount Mall she was surprised because she did not realize counterfeiting was going on, and she questioned the validity of the various brands' contentions that the goods were counterfeit.

Yes Assets and AMM relied on Dickerson to follow-up on allegations of counterfeiting at the Discount Mall. Following the law enforcement raid in November 2014, Dickerson approached each of the tenant-vendors and asked them whether they were selling counterfeit goods. According to Dickerson, all of the tenants denied that their merchandise was counterfeit and Dickerson took them at their word. Jamison, however, admitted that the vendors "probably denied it ... because all people do," and acknowledged that no one would admit to selling counterfeit goods because it would constitute a breach of their lease. Despite these admissions, Jamison testified she was satisfied with the vendors' denials because the Defendants here had no proof or knowledge of whether the items were counterfeit. According to 30(b)(6) testimony of Defendants Yes Assets and AMM, Dickerson gave each tenant a copy of the various notice letters, instructed them to cease selling any counterfeit merchandise, and notified them that the sale of counterfeit goods was a violation of their lease agreements. No other action was taken by Defendants to address counterfeit sales, and Defendants did not respond to any of the notice letters sent by any of the brands, including Plaintiffs.

## III. RELEVANT PROCEDURAL BACKGROUND

Defendants collectively moved for summary judgment, arguing that as mere owners and operators of the Discount Mall, Defendants had no direct involvement with the alleged infringement, no control of the allegedly infringing tenants at the Mall,

and no specific knowledge or notice regarding tenants who were allegedly involved in the violations of Plaintiffs' trademarks.

At a hearing on September 15, 2016, the Court denied Defendants' motion for summary judgment, finding that there are disputed issues of fact that a reasonable jury would have to resolve and weigh in determining the issue of liability in this case. The Court found at the conclusion of the hearing that there was sufficient evidence in the record, even if sometimes in conflict as to their individual roles, that Defendants played a major, dominant role in the operation and management of the Discount Mall and were in a position to take steps to address the alleged issues with counterfeit sales by the individual tenants. The Court found that the evidence raised a genuine and triable issues as to Defendants' willful blindness to the infringing conduct of their tenants, that Defendants had reason to suspect the wrongdoing, had knowledge of the alleged counterfeit sales, and deliberately failed to investigate and take serious, corrective action in light of what was known from the various notice letters and law enforcement raids.

The Court found that despite Defendants' contention that Plaintiffs' December 2014 cease and desist letter only provided generalized knowledge of counterfeit activities because it did not identify specific vendors, the letter provided sufficient individualized notice. The letter was sent immediately following the November 2014 government raid and the manager of the Discount Mall, Greg Dickerson, testified that he had a list of all vendors whose merchandise was seized during the raid, including a list of the merchandise that was seized. This merchandise list included sunglasses that according to Plaintiffs falsely were marketed as Ray–Ban and Oakley sunglasses. Defendants also had

notice of all of the vendors who were arrested during the raids. And Dickerson had conversations with each of the vendors as a result of the raid. Thus, the Court found strong evidence—based on that identification—that Defendants had clear notice as to which vendors were engaging in infringement activities.

The Court found that a reasonable jury could find that that Defendants exhibited willful blindness by failing and refusing to take action after the November 2014 raid. The Court rejected Defendants' argument that secondary liability could not attach based on their contentions that they really didn't know enough and couldn't identify the sunglasses when, in fact, all the vendors had been identified by virtue of the raid, and the merchandise continued to be openly displayed for sale during the walk-throughs that Mr. Dickerson made in the Discount Mall. A reasonable jury could find that Defendants' blind acceptance of the tenants' denial of the charges and hands-off approach was not sufficient under the circumstances presented in the face of evidence of repeated and systemic acts of infringement within the Discount Mall. Thus, the Court found that a reasonable jury could determine that Defendants were able to take proactive action against the tenants within the bounds of their leases to address the continued sale of counterfeit goods

In sum, the Court found that the evidence is ultimately in dispute as to whether the Defendants exercised sufficient control over the means of infringement by continuing to offer the services of the marketplace and the facility as a whole. A reasonable jury could find either for or against the Defendants as to whether it took real action, whether the Defendants were willfully blind and failed to properly investigate whether the goods their vendors were selling were authentic or counterfeit, even though they had very good

reason to suspect that the goods were likely counterfeit.

## IV. DEFENDANTS' SECOND MOTION IN LIMINE

Defendants' Second Motion in Limine is a renewal of the arguments raised at summary judgment that Defendants (a) do not have knowledge of specific counterfeit sales, and (b) do not have actual control over the tenants' sales of alleged counterfeit products. Defendants also disclaim any responsibility for the operation of the Discount Mall until 2009 when AMM took over the lease.

Plaintiffs intend to offer evidence that the Discount Mall has been a hot-bed for vendors to sell illegal "knock-off" goods, including counterfeit Ray–Ban and Oakley sunglasses for several years going back to 2004. Plaintiffs seek to proffer testimony from Wayne Grooms regarding his participation in trademark-related investigations for other brands at the Discount Mall between 2004 to 2008, and that as a result, thousands of items of counterfeit merchandise were seized by law enforcement. Mr. Grooms intends to testify that in the course of his investigations into the sale of other counterfeit merchandise, he observed vendors openly displaying sunglasses bearing Ray–Ban and Oakley trademarks. Plaintiffs also intend to introduce police reports from the City of College Park Police Department from December 15, 2005 to November 13, 2014, regarding law enforcement raids, seizure of counterfeit goods, and arrests of tenants at the Discount Mall for trademark brands other than Luxottica and Oakley.

Plaintiffs assert that evidence of raids, seizures, and arrests at the Discount Mall between 2004 to 2008 were warning signs that counterfeit merchandise was being sold at the Discount Mall and that Defendants were willfully blind to this unlawful

activity. Plaintiffs also assert that during this time Yes Assets, the property owner and landlord, continued to provide the support services necessary for the counterfeiting tenants to conduct their activities for purposes of establishing their contributory liability under the Lanham Act.

### A. Defendants' request to prohibit argument, testimony, and evidence related to sales or purchases involving tenants other than those identified in Plaintiffs' notice letter or related to the seizure of counterfeit goods before Defendants received Plaintiffs' notice letter

Defendants argue that because contributory liability attaches only if they had specific, prior knowledge that a specific tenant is selling, or has sold, counterfeit sunglasses, that sales or purchases involving tenants other than those identified in "the notice letter [7]" and evidence of the seizure of counterfeit goods before Defendants received the notice letter have no relevance to any issue in the case. According to Defendants' motion, Plaintiffs must prove that after having received specific notice of counterfeit sales by the identified tenants, Defendants failed to prevent additional sales by those tenants. Thus, Defendants claim that evidence of the sales and seizures of allegedly counterfeit sunglasses by tenants after Defendants' receipt of the notice letter is only relevant if those sales were by the same tenants identified in the letter.

Plaintiffs argue in response that evidence of past sales of counterfeit goods at the Discount Mall is relevant to the issue of Defendants' knowledge of counterfeiting activity. Plaintiffs' theory of liability against Defendants is that they are contributorily liable for their tenants' (and subtenants') counterfeiting because Defendants knew, or had reason to know, of such activity and continued to lease space to them. According to Plaintiffs, the duration, frequency, and visibility of the law enforcement raids at the Discount Mall between 2004 and 2016 is relevant to establishing Defendants' actual or constructive knowledge regarding the Discount Mall's vendors' activities. Plaintiffs do not directly respond that they intend to introduce evidence as to specific tenants of the Discount Mall other than those identified in their April 2015 notice letter.

■ The Court previously rejected Defendants' arguments at the summary judgment stage. As this Court explained in an identical case brought by Plaintiffs against the nearby Greenbriar Discount Mall, evidence of serious and widespread counterfeiting at the Discount Mall is relevant to determine whether Defendants knew, *or had reason to know*, their tenants were engaging in infringing sales activity. *Luxottica Grp., S.p.A. v. Greenbriar Marketplace II, LLC*, 1:15–CV–01382–AT, 212 F.Supp.3d 1375, 1385, n.9, 2016 WL 5859023, \*7, n.9 (N.D. Ga. Sept. 30, 2016) (citing *Mini Maid*, 967 F.2d at 1522 (stating that if the infringement is serious and widespread, it is more likely that the franchisor knows about and condones the acts of its franchisees)). Liability for contributory infringement necessarily depends upon the scope of the defendant's knowledge about the infringement. *See, e.g., Mini Maid Servs. Co.*, 967 F.2d at 1522; *see also Duty Free Americas, Inc.*, 797

---

7. Defendants do not identify the date of the "notice letter." The December 9, 2014 letter attached to Plaintiffs' original Complaint does not identify specific tenant/vendors, but was sent on the heels of the November 2014 raid.

Plaintiffs' Amended Complaint attaches a second letter dated April 22, 2015 that identifies four booths at which counterfeit versions of Plaintiffs' trademarked products were being sold.

F.3d at 1277. The extent and nature of the violations being committed may be relevant in making this determination. *Mini Maid Servs. Co.*, 967 F.2d at 1522. "If the infringement is serious and widespread, it is more likely that" the defendant knows about and condones the infringing activity. *Id.*

A landlord may be held liable for contributory trademark infringement by continuing to lease space to a tenant whom it knows *or has reason to know* is engaging in trademark infringement even without direct control over the infringing conduct. *See Inwood*, 456 U.S. at 854–55, 102 S.Ct. 2182 (finding that a defendant is contributorially liable for the direct infringement of others if, *inter alia*, the defendant "continues to supply its service to one whom it *knows or has reason to know* is engaging in trademark infringement."); *Goodfellow*, 717 F.3d at 503–05 (holding that a flea market owner and operator who "provide[d] . . . rental booths and storage units for vendors" was contributorily liable when he had reason to know of trademark infringement committed by *some vendors* ); *Fonovisa*, 76 F.3d at 265 (noting that "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [flea market] . . . includ[ing], *inter alia*, the provision of space, utilities, parking, advertising, plumbing, and customers"); *Hard Rock*, 955 F.2d at 1148–49 (applying common law tort doctrines to claim for contributory infringement and stating that a landlord "is responsible for those it permits on its premises 'knowing or having reason to know that the other is acting or will act tortiously' ").

Whether Defendants had knowledge of infringing conduct by their tenants may come from raids by law enforcement agencies, in addition to Plaintiffs' notice letters. *E.g., Fonovisa, Inc. v. Cherry Auction,* *Inc.*, 76 F.3d 259, 264–265 (9th Cir. 1996) (adopting *Hard Rock Cafe's* application of contributory trademark infringement liability to operators of a swap meet who had reason to know of infringing activity after law enforcement officers raided the flea market and seized counterfeit merchandise); *Coach Inc. v. Swap Shop, Inc.*, 916 F.Supp.2d 1271, 1279 (S.D. Fla. 2012) (holding that plaintiffs stated a plausible claim that owners and operators of a flea market were either willfully blind of Lanham Act violations or had actual knowledge of them where prior police raids and seizures of counterfeit bags and other products had occurred, operator was notified of violations, and trademark holder had sent investigators to flea market); *Coach, Inc. v. Gata Corp.*, 2011 WL 2358671, *9 (D. N.H. 2011) (finding that "once law-enforcement agencies began raiding the Flea Market, arresting vendors, and seizing counterfeit merchandize, any lack of specific knowledge on defendants' part could only have resulted from willful blindness; those raids provided defendants with a veritable roadmap to infringing vendors and merchandise"); *Omega SA v. 375 Canal, LLC*, 12 CIV. 6979 (PAC), 2016 WL 7439359, at *3 (S.D.N.Y. Dec. 22, 2016) ("Trademark owner's warning letters or law enforcement raids of the premises may give a service provider sufficient knowledge of specific infringements."); *Luxottica Grp., S.p.A. v. Greenbriar Marketplace II, LLC*, 1:15–CV–01382–AT, 212 F.Supp.3d at 1385-86, 2016 WL 5859023, *7 (finding that principal's knowledge of law enforcement raids (prior to and after Plaintiffs filed their lawsuit) during which counterfeit Ray-Bans and Oakley sunglasses were seized from several individual vendors/tenants was relevant to landlord's contributory liability).

■ Thus, evidence of the alleged pervasive nature of counterfeiting at the Discount Mall is relevant to establish the scope of Defendants' knowledge and level of control Defendants exercised over their property and the conduct of their tenants. However, such evidence is only relevant to the extent Defendants knew or had reason to know about the raids, seizures, and arrests of the tenants at the Discount Mall. The majority of the evidence on this issue presented thus far in the case has been confined to the 2009 to 2015 timeframe. Plaintiffs did not assert in either their original or Amended Complaints any allegations regarding raids, or counterfeit sales at the Discount Mall prior to 2013, and they did not rely on any evidence at summary judgment regarding Defendants' involvement with the Discount Mall prior to 2009.

■ The evidence submitted by Plaintiffs following the Pretrial Conference regarding the scope of Defendants' alleged knowledge of counterfeit sales at the Discount Mall from 2004 to 2009 is extremely thin when compared to the evidence presented at summary judgment of the more recent investigations, raids, and seizures. As recounted above, when Yes Assets purchased the property in 2004, the Discount Mall portion of the property was operated and managed by an unrelated third-party, Patrick Swindall, under a pre-existing lease that remained in effect until November 2009. Plaintiffs have not pointed to any direct, concrete evidence that Yes Assets or any of the individual Defendants had any knowledge of the raids at the Discount Mall during Mr. Swindall's management from 2004 to 2009. Nor do any of the police reports Plaintiffs intend to offer of the raids from December 2005 to April 2009, indicate that the police officers or private investigators spoke with anyone from Yes Assets, as Landlord, regarding the criminal activity of the tenants at the Discount Mall.

Instead, Plaintiffs rely on: (1) the language of the original 1990 Lease for the portion of the Shopping Center that now operates as the Discount Mall that Yes Assets inherited upon purchasing the Shopping Center in 2004; (2) the language of the 1992 Sublease of the Discount Mall with Patrick Swindall that Yes Assets inherited upon purchasing the Shopping Center in 2004; (3) Alice Jamison's testimony as the 30(b)(6) representative of Yes Assets that she has managed the day to day affairs of the Shopping Center since 2004; (4) a Master List of tenants of the Shopping Center purportedly showing that the Discount Mall was the largest and highest paying tenant; (5) a one-page spreadsheet titled "Old National Mar 07" listing space numbers for over 20 business names, and the due dates and amounts of rent due and received which Plaintiffs contend pertain to the Discount Mall (as opposed to the tenants of the Shopping Center strip mall store fronts);[8] and (6) an August 14, 2004 lease between Yes Assets and Class Hour Fashion.[9]

■ Rather than point to evidence that Defendants knew or had reason to know of counterfeit sales at the Discount Mall from 2004 to 2009 before Defendants took over the lease to the Discount Mall, Plaintiffs focus entirely on the assertion that Defendants had the power and authority under

---

**8.** There is no indication that this spreadsheet references vendor booths inside the Discount Mall as Plaintiffs contend. It is possible that the spreadsheet is related to the outside tenants of the Shopping Center. It is impossible to know without some testimony by one of the

Defendants or their agents regarding what the document is.

**9.** This lease, executed by Alice Jamison, is for one of the outside tenants of the Shopping Center—not a tenant of the Discount Mall.

the various lease agreements to exercise control over the unlawful activities taking place at the Discount Mall. However, the circumstances that trigger contributory liability where there is an alleged failure to take an action that would have had a curbing effect, require that the defendant first had sufficient knowledge or a reason to know that the entities with which it was directly affiliated, were engaging in infringing activity.

It may very well be that Yes Assets, Jerome Yeh, Jenny Yeh, or Alice Jamison knew or had reason to know that Patrick Swindall allowed the open and notorious sale of counterfeit goods at the Discount Mall to go unchecked for 5 years before AMM took over—and that they turned a blind eye. But it may be that they were unaware there was a widespread counterfeiting operation inside the Discount Mall, or that they learned of it shortly before taking over the operation and management of the Mall in December 2009. However, it does appear that the Yehs and Alice Jamison likely had *some* information based on (1) Mr. Dickerson's veiled reference in his deposition to "some problems" at the Discount Mall shortly before he was hired in November 2009 as a result of prior management issues, and (2) Ms. Jamison's indication in her deposition that Mr. Swindall was the cause of a counterfeiting problem in response to a raid that occurred at the Discount Mall in 2014. And Plaintiffs may be able to establish that Alice Jamison, who was admittedly managing the surrounding Shopping Center, of which the Discount Mall is situated in the center, would have had to deliberately ignore the apparent monthly law enforcement raids of the Shopping Center's major tenant.

Defendants may be unduly prejudiced if Plaintiffs are allowed to introduce independent evidence of pre–2009 raids and counterfeit good marketing *if* Plaintiffs prove unable to establish foundation evidence at

trial that plausibly indicates Defendants' (or their agents) had sufficient knowledge or a reason to know that the entities with which they were directly affiliated, were engaging in or implicitly authorizing or maintaining a blind eye to infringing activity. Accordingly, before counsel references or seeks to introduce any evidence of raids or counterfeit sales at the Discount Mall prior to 2009 during argument or presentation to the jury at trial, Plaintiffs will be required to lay an evidentiary foundation as to the scope of Defendants' knowledge or ostrich like conduct. The Court will therefore allow Plaintiffs to cross-examine any of the individual Defendants or their agents regarding the scope of Defendants' knowledge of prior counterfeiting issues arising at the Shopping Center/Discount Mall when they purchased the Shopping Center and became actively involved in its management. In that context, Plaintiffs can also cross examine Defendants as to what they understood to be the nature of the prior or continuing business at the Shopping Center and Discount Mall. The Defendants and their agents can be questioned about their knowledge about the police raids and arrests of tenants that were conducted at their property and their knowledge of such, even if the actual reports are not admitted.

Similarly, the Court will only consider allowing Wayne Grooms to testify regarding his observations from 2005 to 2008 if: (a) Plaintiffs first establishes a reasonable or sufficient factual foundation at trial that Defendants were engaged in direct operational management of the Discount Mall during that timeframe; or (b) were on such clear notice of their tenants' counterfeiting activity that they would have been obligated under the legal terms of the tenant leases (based on requirements for compliance with the law) to take action.

## B. Defendants' request to prohibit argument or evidence related to alleged sales or seizure or goods other than Ray–Ban or Oakley Sunglasses

■ Defendants argue that sales of alleged counterfeit goods from other brands are not relevant to Defendants' liability for contributory infringement of Oakleys and Ray–Bans. According to Defendants, for other branded merchandise to have any relevance to Plaintiffs' claim, it must first be proven that *that* merchandise was counterfeit. In other words, if tenants at the discount mall sold *genuine* Louis Vuitton or Coach products, these sales would not put Defendants on notice that Ray–Ban and Oakley products also sold at the mall are *counterfeit*. Defendants contend that there is no competent evidence in the record as to the authenticity of merchandise bearing brands other than Ray–Ban or Oakley.

Plaintiffs argue in response that evidence of other counterfeiting is relevant to the consideration of a contributory defendant's control over the infringement activities of its tenants. The presence of a substantial amount of counterfeits of other luxury brands increases the likelihood of Defendants' knowing about counterfeiting at the Discount Mall in general, and is relevant to the Defendants' intent with respect to permitting sales of other counterfeit goods including those bearing Plaintiffs' trademarks. According to Plaintiffs, the evidence of counterfeit sales of Luxottica and Oakley sunglasses is inextricably intertwined with the sale of other counterfeit products—i.e., the photographs taken at the Discount Mall show counterfeit items displayed for sale by vendors with various brands co-mingled with Plaintiffs' products. In effect, they contend that the sale of intermingled counterfeit products is the de-facto business model for the Discount Mall. Plaintiffs assert their evidence shows Defendants have knowledge of the widespread counterfeiting problem at the Discount Mall and their willful blindness toward the problem. Specifically, Plaintiffs note that Defendants' manager, Greg Dickerson, testified that (a) he spoke with Nike's investigator regarding counterfeit products being sold by vendors, and (b) Defendants received cease and desist letters from Coach, Louis Vuitton, and Gucci following a law enforcement raid in which counterfeit products were seized.

■ Previously in the *Greenbriar* case, this Court held that while Defendants cannot be held liable to Luxottica for the infringing sale of counterfeit Coach or Louis Vuitton merchandise at the property, the evidence of the widespread counterfeiting problem and Defendants' knowledge of the same is relevant to the consideration of the Defendants' knowledge (or blindness) as well as control of the infringing conduct of its tenants. *Luxottica Grp., S.p.A. v. Greenbriar Marketplace II, LLC*, 212 F.Supp.3d at 1385, n.9, 2016 WL 5859023, at *7, n.9 (citing *Mini Maid*, 967 F.2d at 1522). This Court thus recognizes that evidence that Defendants were aware of a global counterfeiting problem as a whole at the Discount Mall supports a claim for contributory liability under the Lanham Act. *See also Coach, Inc. v. Gata Corp.*, 2011 WL 2358671, at *8 (finding that "Coach has met its burden of producing undisputed evidence of defendants' knowledge of the underlying infringement. It is undisputed that: (1) "Prior to the 2009 and 2010 raids on the ... Flea Market by federal and local law enforcement officials, the Counterfeit Merchandise offered for sale at the Flea Market, including the Counterfeit Coach Merchandise, was openly displayed for sale by vendors at the ... Flea Market").

That said, Defendants' argument is well-taken and this Court does not intend for

this to become a trial about the alleged sales of other counterfeit merchandise rather than a trial about the sale of Plaintiffs' products. Accordingly, Plaintiffs are **ADVISED** to limit the extent to which they rely on evidence of sales of other counterfeit merchandise and ensure such evidence does not outweigh the scope of the evidence of counterfeit sales of its own sunglasses.

 In a supplemental brief submitted after the Pretrial Conference, Defendants challenge the admissibility of the police reports Plaintiffs intend to offer regarding the raids on the Discount Mall where thousands of items of counterfeit merchandise from other brands were seized. Defendants contend that regardless of Plaintiffs' attempt to redact any "hearsay within hearsay" contained in the police reports, the reports themselves are still inadmissible hearsay, and do not include factual findings based on the knowledge of observations of the officers who prepared the reports. According to Defendants, any references to counterfeit items is instead based on the non-disclosed opinion testimony of the trademark investigators who will not testify at trial.

The Court has reviewed each of the police reports and finds Defendants' characterization to be inaccurate. While it is true that some of the police reports are based solely on the findings of the trademarked brand's investigators, a large number of the reports are based on the police officers' own personal observations of the quality of items such as DVDs, jeans and shirts, and the conduct of the vendors at the Discount Mall. Some of the officers were present for multiple raids and became familiar with the various brands and apparently developed the ability to distinguish between authentic and fake merchandise. In addition, the officers often reported that upon entry to the Discount Mall, vendors would immediately begin closing up their booths and attempting to flee the premises. Accordingly, the Court finds that a good majority of the police reports are not inadmissible for the reasons stated in Defendants' supplemental briefs.

## V. CONCLUSION

For the reasons set forth above, Defendants' Second Motion in Limine [Doc. 108] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED** this 10th day of February, 2017.